NORTH CAROLINA NATIONAL BANK v. RUPERT A. HARWELL, JR.

No. 7718DC859

(Filed 3 October 1978)

1. **Rules of Civil Procedure § 56.3— summary judgment—insufficiency of supporting material—failure to object**

   Failure of defendant to make timely objection to the insufficiency of plaintiff's pleadings and affidavits submitted in support of its motion for summary judgment is deemed a waiver of any objections.

2. **Uniform Commercial Code § 36— dishonored check—timeliness of notice— branch banks as separate banks**

   In an action to recover an overdraft resulting from a dishonored check where defendant presented the check to plaintiff's Wilmington branch, the bank on which the check was drawn, for deposit to his account with plaintiff's High Point branch, the High Point branch and its bookkeeping department in plaintiff's Western Operations Center were functionally one bank while the Wilmington branch and its bookkeeping department in plaintiff's Eastern Operations Center were functionally a separate bank; therefore, the branches were entitled to separate bank status under G.S. 25-4-106 for the purpose of determining time limits for notifying defendant of the dishonoring of the check in question.

3. **Uniform Commercial Code § 36— dishonored check—right of charge-back— notice of dishonor timely**

   Plaintiff's branches, operating as separate banks, sent notice of dishonor of a check within the time requirements of the Uniform Commercial Code so as to preserve the ultimate right of charge-back by the branch at High Point where the payor bank, the branch at Wilmington, returned the check to the transferor, the High Point branch, before midnight on its next banking day following the banking day on which it received the check in question, and the High Point branch, the collecting bank, sent defendant notification of the dishonor on the day it received the dishonored check, thus acting well within its statutory deadline. G.S. 25-4-105; 25-4-301; 25-4-212.

APPEAL by defendant from *Alexander (Elreta M.), Judge.* Judgment entered 19 September 1977 in District Court, GUILFORD County. Heard in the Court of Appeals 15 August 1978.

Plaintiff initiated this action by filing its complaint 26 July 1977 seeking to recover from defendant, its customer, an overdraft created when the plaintiff charged back to defendant's account a check which had been dishonored. The defendant filed no answer. On 17 August 1977, defendant moved for summary judgment without supporting pleadings or affidavits. On 31 August 1977, plaintiff moved for summary judgment supported by its complaint, amended complaint, and affidavits.

There exists no material question of fact as to the occurrence and sequence of the following events: Carolina Forest Products, Inc., (CFP) drew a $3,356.32 check in favor of the defendant written on CFP's account with the Wilmington branch of North Carolina National Bank (NCNB-W) on Friday, 18 March 1977. On that same day, but after NCNB-W's cutoff hour, defendant presented the check at NCNB-W for deposit to his account with NCNB-High Point (NCNB-HP). Therefore, the check was, in legal effect, presented on the banking day of Monday, 21 March 1977.

On 21 March 1977 the check was processed through NCNB's Eastern Operations Center (Raleigh). This operations center works essentially as the central bookkeeping operations for NCNB branches in Eastern North Carolina. This processing included wiring the deposit to NCNB's Western Operations Center (Charlotte) for provisional credit to the depositor's account with NCNB-HP. The process of debiting the drawer's account for the amount of the check took place in the Eastern Operations Center.

On 22 March 1977 the bank's "Transactions Not Posted Report" indicated the deposited check nonposted due to insufficient funds. That same day the check was returned to the Western Operations Center for charge-back to the defendant's account.

On 23 March 1977 the Western Operations Center received the dishonored check, charged it back to the defendant's account, and mailed the check along with a notice of dishonor to the defendant. In the interim, defendant had written a $3,300 check on his NCNB-HP account. The subsequent charge-back resulted in an overdraft in the defendant's account of $3,282.98. The defendant has refused to reimburse the plaintiff for the amount of the overdraft.

From the District Court's granting of plaintiff's motion for summary judgment, the defendant appeals. Defendant also appeals the denial of his motion for summary judgment.

*Hugh C. Bennett, Jr., for plaintiff appellee.*

*Bencini, Wyatt, Early & Harris, by William E. Wheeler, for defendant appellant.*

MORRIS, Judge.

The defendant has challenged the District Court's order granting summary judgment for plaintiff on two grounds. First, he asserts, for the first time on appeal, that summary judgment was improper because the pleadings and affidavits in support of the motion did not satisfy the requirements of G.S. 1A-1, Rule 56(e). Second, the defendant argues that as a matter of law, he, not the plaintiff, is entitled to summary judgment in his favor.

[1] Defendant made no objection in the trial court to the insufficiency of plaintiff's pleadings and affidavits submitted in support of the motion for summary judgment. Failure to make a timely objection to the form of affidavits supporting a motion for summary judgment is deemed a waiver of any objections. *Noblett v. General Electric Credit Corp.*, 400 F. 2d 442 (10th Cir. 1968), *cert. den.*, 393 U.S. 935, 89 S.Ct. 295, 21 L.Ed. 2d 271 (1968); *Auto Drive-Away Company of Hialeah, Inc. v. I.C.C.*, 360 F. 2d 446 (5th Cir. 1966), *see e.g.*, Wright and Miller, Federal Practice and Procedure: Civil, § 2738, p. 706-707. Technical objections based on G.S. 1A-1, Rule 56(e), are not timely made when they are first raised on appeal. This is especially so when there was no attempt to contradict facts and thus no question of material fact before the court. *Auto Drive-Away Company of Hialeah, Inc. v. I.C.C.*, *supra*.

The ultimate issue properly before this Court, therefore, is whether NCNB preserved its right of charge-back against the defendant's account. *See* G.S. 25-4-212. The resolution of this question requires a determination of whether the bank sent notice of dishonor within the time constraints imposed by G.S. Chapter 25, Art. 4. (North Carolina version of the Uniform Commercial Code, Article 4, Bank Deposits and Collections.)

---

---

Defendant argues that plaintiff's right to charge-back is governed by his status as both "payor bank" and "depositary bank" and that plaintiff failed to notify the defendant of dishonor within the time limits for such notice. *See* G.S. 25-4-105; 25-4-212(3); 25-4-301; 25-4-213(1)(d); 25-4-104(h).

[2] Plaintiff, on the other hand, urges this Court to consider the effects of G.S. 25-4-106, as amended in 1967, on the obligations of the plaintiff.

> "§ 25-4-106. *Separate office of a bank.* — A branch or separate office of a bank is a separate bank for the purpose of computing the time within which and determining the place at or to which action may be taken or notices or orders shall be given under this article and under article 3."

Plaintiff brings to this Court for the first time since adoption of the Uniform Commercial Code the question of the applicability and effect of G.S. 25-4-106.

The few reported cases which could have applied that section, as it appears in the statutes of the respective states, have either ignored the section or found it unnecessary for decision. *See Kirby v. First and Merchants National Bank*, 210 Va. 88, 168 S.E. 2d 273 (1969) (discussed in White and Summers, Uniform Commercial Code 531-532, n. 29 (1972) ), and *Manufacturers Hanover Trust Co. v. Akpan*, 398 N.Y.S. 2d 477, 91 Misc. 2d 622, 22 U.C.C. Rep. Serv. 1009 (1977).

The application of G.S. 25-4-106 is not mandatory. The comments indicate that a branch or separate office may be treated as a separate bank for certain purposes while maintaining the single legal entity for other reasons. The comments also correctly note that, as a practical matter, many branches function as separate banks in the handling and payment of certain items and require time for doing so. This is especially true in states where branch banking is permitted throughout a state. G.S. 25-4-106, Comment 2; *Cf.* G.S. 53-62 (permitting branch banking in North Carolina). The comment specifically suggests that, where Article 4 imposes time limits (such as the notice of dishonor in this case), the branch which functions as a separate bank should be entitled to the time limits available to a separate bank. *Id.*, Comment 4.

Prior to the 1967 amendment, G.S. 25-4-106 required that a bank maintain its own deposit ledgers before it was entitled to separate bank treatment. 1965 N.C. Sess. Laws, Chapter 700, Sec. 1. Such a requirement was left optional to the states in the official draft of the Uniform Commercial Code. Clarks, Bailey, and Young, *Bank Deposits and Collections,* ALI/ABA Joint Committee on Continuing Legal Education 33 (4th Ed. 1972). The draftsmen's intent was that a bank and its branch which maintained a central bookkeeping facility would be treated as only one bank. Since collection items would generally only be handled through the central processing, it would not be proper to treat them separately. *Id.*

Our legislature deleted the provisions requiring the maintenance of separate deposit ledgers. *See* 1967 N.C. Sess. Laws, Chapter 562, Sec. 1. The legislature's intent was obviously to lessen the requirements for a branch to attain separate bank status. This amendment is consistent with the legislature's encouragement of statewide branch banking to serve the "needs and convenience" of the public. *See* G.S. 53-62. Since the official comments make it clear that G.S. 25-4-106 should be given a practical application depending on the particular banking practices established and followed in this State, it is necessary to look to the operations of the plaintiff's branches.

The plaintiff's pleadings and affidavits outline the basic structure of NCNB's operations. The bank apparently has divided the State into an eastern and western operations district. The Eastern Operations Center (Raleigh) and the Western Operations Center (Charlotte) function as the bookkeeping centers for all of the branches located in their respective districts. Therefore, when NCNB-HP in the western operations district deals with NCNB-W in the Eastern Operations Center for collection purposes, the banks are in many practical respects operating as separate banks. The accounts of customers in the eastern and western districts are maintained separately in the respective operations centers.

Under the facts in this case, G.S. 25-4-106 as amended is particularly applicable. NCNB-HP and its bookkeeping department in the Western Operations Center are functionally one bank while NCNB-W and its bookkeeping department in the Eastern Operations Center are functionally a separate bank. *See generally Farmers and Merchants Bank v. Bank of America,* 20 Cal. App. 3d

939, 98 Cal. Reptr. 381 (1971). For the foregoing reasons, we hold that NCNB-HP and NCNB-W are entitled to separate bank status under G.S. 25-4-106.

Since each branch operates through a different operations center, it is not necessary to determine whether two branches operating through the same operations center should be entitled to separate bank status.

[3] We must now turn to the statute to determine if the plaintiff's branches, operating as separate banks, sent notice of dishonor within the requirements of the statute so as to preserve the ultimate right of charge-back by NCNB-HP. Since there are now two "separate banks" involved in the transaction, it is necessary to determine whether each "separate bank" acted within its respective time limit. *See* 3 Anderson: Uniform Commercial Code, § 4-106:7, p. 187 (2d Ed. 1971).

## I.

NCNB-W is clearly the "payor bank" in this transaction. G.S. 25-4-105(b). Therefore, before NCNB-W may revoke any settlement it must satisfy the requirements of G.S. 25-4-301 which provides as follows:

"(1) Where an authorized settlement for a demand item (other than a documentary draft) received by a payor bank otherwise than for immediate payment over the counter has been made before midnight of the banking day of receipt the payor bank may revoke the settlement and recover any payment if before it has made final payment (subsection (1) of § 25-4-213) and before *its* midnight deadline it

(a) returns the item; or

(b) sends written notice of dishonor or nonpayment if the item is held for protest or is otherwise unavailable for return.

(2) If a demand item is received by a payor bank for credit on its books it may return such item or send notice of dishonor and may revoke any credit given or recover the amount thereof withdrawn by its customer, if it acts within the time limit and in the manner specified in the preceding subsection.

(3) Unless previous notice of dishonor has been sent an item is dishonored at the time when for purposes of dishonor it is returned or notice sent in accordance with this section.

(4) An item is returned:

(a) as to an item received through a clearing house, when it is delivered to the presenting or last collecting bank or to the clearing house or is sent or delivered in accordance with its rules; or

(b) in all other cases, when it is sent or delivered to the bank's customer or transferor or pursuant to his instructions." (Emphasis added.)

The recognition of separate bank status requires a determination of to whom the payor bank must return the item. That return must then comply with the time limitations imposed by the statute.

Under the facts in this case, the item is returned when it is sent or delivered to the "transferor". G.S. 25-4-301(4)(b). Since each branch of NCNB is receiving separate bank status, the payor bank need not send notice directly to Harwell. Defendant is not NCNB-W's "customer" since NCNB-W is a "separate bank". Although Harwell physically presented the check for deposit in Wilmington, the deposit was to his NCNB-HP account. Therefore, in all practical respects, NCNB-HP is the "collecting bank" and, since it is a "separate bank", it is the "transferor" of the check for collection and entitled to return or notice of the dishonored item.

Under G.S. 25-4-301, the payor bank (NCNB-W) must return the item before it has made final payment and before its midnight deadline. Under these facts, the item is finally paid by the payor bank (NCNB-W) only if it has failed to revoke the provisional settlement in the time and manner permitted by statute. G.S. 25-4-213(1)(d). There is nothing in the record to suggest the existence of any applicable agreement which would lengthen the statutory time limit. In the absence of contrary agreement, the "midnight deadline" is the cutoff for notification by the payor bank. G.S. 25-4-301. The "[m]idnight deadline with respect to a bank is midnight on its next banking day following the banking day on which it receives the relevant item or notice or from

which the time for taking action commences to run, whichever is later." G.S. 25-4-104(h).

The record shows that NCNB-W, operating through its Eastern Operations Center, returned the deposited check to NCNB-HP operating through the Western Operations Center before midnight, 22 March 1977. Since the deposit was made on the banking day of 21 March 1977, the payor bank, NCNB-W, acted within its midnight deadline. Therefore, the payor bank preserved its right to revoke settlement.

## II.

Though North Carolina National Bank is a single legal entity for purposes of ultimate loss in this case and although NCNB-W acted within its midnight deadline, the defendant will nevertheless ultimately prevail unless NCNB-HP also gave proper notice of the dishonor of the deposited check.

Since NCNB-HP is in practical effect the "collecting bank" in this transaction as pointed out above, its right of charge-back against the defendant differs from that of the payor bank. NCNB-HP is entitled to its charge-back if it has acted in conformity with the following statutory provisions:

> "§ 25-4-212. *Right of charge-back or refund.*—(1) If a collecting bank has made provisional settlement with its customer for an item and itself fails by reason of dishonor, suspension of payments by a bank or otherwise to receive a settlement for the item which is or becomes final, the bank may revoke the settlement given by it, charge-back the amount of any credit given for the item to its customer's account or obtain refund from its customer whether or not it is able to return the item if by its midnight deadline or within a longer reasonable time after it learns the facts it returns the item or sends notification of the facts. These rights to revoke, charge-back and obtain refund terminate if and when a settlement for the item received by the bank is or becomes final (subsection (3) of § 25-4-211 and subsections (2) and (3) of § 25-4-213).
>
> (2) Within the time and manner prescribed by this section and § 25-4-301, an intermediary or payor bank, as the case may be, may return an unpaid item directly to the depositary bank and may send for collection a draft on the depositary

bank and obtain reimbursement. In such case, if the depositary bank has received provisional settlement for the item, it must reimburse the bank drawing the draft and any provisional credits for the item between banks shall become and remain final.

(3) A depositary bank which is also the payor may charge-back the amount of an item to its customer's account or obtain refund in accordance with the section governing return of an item received by a payor bank for credit on its books (§ 25-4-301).

(4) The right to charge-back is not affected by

　　(a) prior use of the credit given for the item; or

　　(b) failure by any bank to exercise ordinary care with respect to the item but any bank so failing remains liable.

(5) A failure to charge-back or claim refund does not affect other rights of the bank against the customer or any other party.

(6) If credit is given in dollars as the equivalent of the value of an item payable in a foreign currency the dollar amount of any charge-back or refund shall be calculated on the basis of the buying sight rate for the foreign currency prevailing on the day when the person entitled to the charge-back or refund learns that it will not receive payment in ordinary course."

NCNB-HP, acting through its Western Operations Center, received the returned check for charge-back on 23 March 1977. Furthermore, NCNB-HP mailed the returned check and notice of dishonor to defendant on 23 March 1977. When NCNB-HP sent notification of the dishonor on the day it received the dishonored item, it acted well within its midnight deadline. Therefore, it is unnecessary to decide if under the statute NCNB-HP could have taken more time to send notice of dishonor and still have acted within the "reasonable time" limits of the applicable statute. Finally, since NCNB-W acted within its deadline. NCNB-HP received no final settlement on the item to deny its right of charge-back. See G.S. 25-4-212(1) (last sentence).

For the foregoing reasons, we find that the plaintiff's NCNB-HP branch was properly entitled to a charge-back against the defendant's account to cover the amount of the overdraft. Therefore, the District Court properly granted plaintiff's motion for summary judgment and properly denied defendant's cross motion for summary judgment.

The judgment of the District Court is

Affirmed.

Judges HEDRICK and WEBB concur.