**PULASKI BANK AND TRUST CO., Appellant,**

v.

**TEXAS AMERICAN BANK/FORT WORTH, N.A., Texas American Bank/West Side, N.A., Texas American Services, Inc., Appellees.**

No. 05-87-00951-CV.

Court of Appeals of Texas, Dallas.

Sept. 13, 1988.

Rehearing Denied Nov. 1, 1988.

W. Ralph Canada, Jr., J. Richard Tubb, Dallas, for appellant.

Alan Wilson, Dallas, for appellees.

Before WHITHAM, ROWE and THOMAS, JJ.

THOMAS, Justice.

Appellant, Pulaski Bank and Trust Company, sued Texas American Bank/Fort Worth (TAB/Fort Worth), Texas American Bank/West Side (TAB/West Side) and Texas American Services, Inc. (TASI), appellees, alleging that they were liable for losses suffered by Pulaski when notice of dishonor of a $150,000 check drawn upon TAB/West Side was not timely relayed to Pulaski. After a nonjury trial, the trial court entered a take-nothing judgment against TAB/West Side and TASI and further entered judgment in favor of Pulaski against TAB/Forth Worth for $8,202.14. In three points of error, Pulaski contends that the trial court erred: 1) in concluding that TAB/West Side was not liable for Pulaski's loss, because as a matter of law TAB/West Side did not timely return the check; 2) in using the wrong measure of damages after imposing liability upon TAB/Fort Worth; and 3) in failing to award attorney's fees to Pulaski. We find no merit in any of Pulaski's points of error, and affirm the trial court's judgment.

## STATUTORY FRAMEWORK

This action is governed by chapter 4 of the Uniform Commercial Code.[1] Chapter 4 sets out the method by which a bank in which a check is deposited may be finally paid by the bank upon which the check is drawn. It has been said that chapter 4 provides the "traffic rules" which keep the bank collection process flowing smoothly. Malcolm, *How Bank Collection Works—Article 4 of the Uniform Commercial Code,* 11 HOW. L.J. 71, 86 (1965) (hereinafter cited as "How Bank Collection Works"). In order to place the facts of this case in context, we must first set out the framework of chapter 4.

To begin the collection process on a check, the person having possession of the item must transfer it to a bank, but not necessarily the bank through which or upon which the check is drawn. *See* Annot., 84 A.L.R.3d 1073, 1076 (1978). The first bank to which a check is transferred for collection is called the depositary bank. *See* § 4.105(1); *Union Bank of Benton v. First National Bank,* 621 F.2d 790, 793 (5th Cir.1980). After the depositary bank has processed the check and entered a provisional credit to the account of its depositor, the bank will transfer the check to another bank which may be the first of many banks that will handle the check before it reaches the bank upon which it is drawn. *See* Annot., 84 A.L.R.3d at 1077; *How Bank Collection Works,* 11 HOW.L.J. at 71–74.

1. TEX.BUS. & COM.CODE ANN. § 4.101 et seq. (Vernon 1968 & Vernon Supp.1988). All statutory references, unless otherwise designated, will be to the Texas Business and Commerce Code (Texas U.C.C.).

The last bank in the chain—the bank by which an item is payable as drawn—is denominated the payor bank. *See* § 4.105(2); *Lockhart Savings & Loan Assn. v. RepublicBank Austin*, 720 S.W.2d 193, 194 (Tex. App.—Austin 1986, writ ref'd n.r.e.); *cf. Hamby Co. v. Seminole State Bank*, 652 S.W.2d 939, 941 (Tex.1983) (defining payor bank in case involving documentary draft). The other banks in the chain are intermediary banks and collecting banks. An intermediary bank is any bank to which an item is transferred in the course of collection, except the depositary or payor bank. *See* § 4.105(3); Annot., 84 A.L.R.3d at 1077. A collecting bank is one which handles the check for collection, but not the payor bank. *See* § 4.105(4); *Ohio Bell Telephone Co. v. BancOhio National Bank*, 1 Ohio Misc.2d 11, 440 N.E.2d 69, 71 (1982). These classifications of banks in the collection process are not exclusive. Thus, it is entirely possible that a depositary bank could also be a collecting bank. *See* § 4.105(1) & (4); Annot., 84 A.L.R.3d at 1076 & n. 5.

As the check moves along the chain from the depositary bank to the payor bank, all the banks in the chain enter provisional debits and credits on the account of the bank from which and to which the check is transferred. These provisional credits are termed provisional settlements under chapter 4. *See* § 4.104(a)(10); *Lockhart Savings & Loan*, 720 S.W.2d at 194. As the check passes from the depositary bank to the payor bank through collecting banks, each collecting bank must act seasonably in forwarding the check. A bank acts seasonably if it acts before its midnight deadline following receipt of the check. *See* § 4.202(b); *Wilhelm Foods, Inc. v. National Bank of North America*, 388 F.Supp. 1376, 1379 (D.C.N.Y.1974). The midnight deadline is midnight on the next banking day following the banking day on which the bank receives the check. *See* § 4.104(a)(8); *First State Bank of McKinney v. American Bank of Sherman*, 732 S.W.2d 404, 405 (Tex.App.—Dallas 1987, no writ).

When the check reaches the payor bank, that bank must decide whether to pay the check or dishonor the check. If the payor bank pays the check, all the provisional settlements among the banks in the collection chain become final. *See* § 4.213; *Riggs v. State*, 34 Md.App. 324, 367 A.2d 22, 26 n. 5 (1976). If the payor bank decides to dishonor the check, it must return the item or send notice of dishonor to the intermediary bank from which it received the check. The payor bank must take this step before its midnight deadline. *See* § 4.301; *North Carolina National Bank v. Harwell*, 38 N.C.App. 190, 247 S.E.2d 720, 724 (1978), *pet. denied*, 296 N.C. 410, 267 S.E.2d 656 (1979). If the payor bank does not return the item or send notice of dishonor before its midnight deadline, the provisional settlements become final. *See* § 4.213(a)(3); Annot., 23 A.L.R.4th 203, 216–18 (1983). Until a check is finally paid, a collecting bank which makes a provisional settlement has the right to charge back the amount of any credit given or to obtain a refund from the bank it credited. *See* § 4.212. The right of charge-back terminates when a settlement becomes final. *Id; Regal Tour, Inc. v. European American Bank*, 108 Misc.2d 699, 438 N.Y.S.2d 947, 949 (1981).

A *payor* bank that does not timely return the check or send notice of dishonor becomes liable to the depositary bank *for the full amount of the check. See* §§ 4.213(a) & 4.302; *Hamby Co.*, 652 S.W.2d at 941; *Pecos County State Bank v. El Paso Livestock Auction Co.*, 586 S.W.2d 183, 187 (Tex.Civ.App.—El Paso 1979, writ ref'd n.r.e.). A collecting bank becomes liable if it fails to use ordinary care in returning items or giving notice of dishonor by its midnight deadline. *See* § 4.202; *Citizens Bank, Bentonville v. Chitty*, 285 Ark. 55, 684 S.W.2d 814, 816 (1985). In such instances, the *collecting* bank's liability is measured by the amount of the check reduced by an amount which could not have been realized by the use of ordinary care by the collecting bank. *See* § 4.103(e); *Marquette National Bank v. Heritage Pullman Bank & Trust Co.*, 109 Ill.App.3d 532, 65 Ill.Dec. 178, 181, 440

N.E.2d 1033, 1036 (1982); *Whitehall Packing Co. v. First National City Bank*, 55 A.D.2d 675, 390 N.Y.S.2d 189, 191 (1976).

### FACTUAL BACKGROUND

On February 5, 1985, Laboratory Management, Inc. deposited into its account at Pulaski, a Little Rock, Arkansas bank, a check in the amount of $150,000. The check was made by Fairway Farms, Inc., and was drawn on TAB/West Side, a Fort Worth bank. Lab Management received a provisional credit in the amount of $150,000 at that time. Pulaski immediately transmitted the check for collection to its correspondent bank, Worthen Bank & Trust Company of Little Rock. Immediately upon receiving the check on February 6th, Worthen sent the check for collection to MBank Dallas, Worthen's corresponding bank in Dallas. MBank Dallas, still on February 6th, delivered the check to MBank Fort Worth.

That same day, MBank Fort Worth delivered the check to the Fort Worth Clearinghouse. Since TAB/West Side is not a "clearing member," it could not participate in the exchange of items at the clearinghouse. Therefore, TAB/Fort Worth, a clearing member, received for collection the $150,000 check payable by TAB/West Side. The clearinghouse sent the check to TASI, an off-premises data processing center used by both TAB/Fort Worth and TAB/West Side.

TASI received the check on February 6th. During the computerized processing procedure, the check was sorted into the TAB/West Side reject pocket and was listed on the TAB/West Side rejects list because of insufficient funds in Fairway Farm's account. The rejects list was delivered to TAB/West Side by 8:00 a.m. on February 7th. Barry Smith, the account officer responsible for the Fairway Farms account upon which the $150,000 check was drawn, was notified that there were insufficient funds to cover the check. Smith decided that the check should not be paid and informed the customer service department of TAB/West Side that the check should be returned unpaid. The rejects list was transmitted by courier to TASI between 10:00 a.m. and 11:00 a.m. on February 7th. Thereafter, the check was manually pulled and marked to be returned. The check was then taken to the customer accounting, or bookkeeping, department at TASI. Because of the directions of TAB/West Side that the check should be returned unpaid, the ledger entries previously made were reversed.

The check was then taken to the return item department. The testimony revealed that the return item department represented TAB/Fort Worth in the transaction at this point in time. According to the testimony, once the check was physically pulled and the entries to the general ledgers were reversed, TAB/West Side was "out of the picture." Although it is disputed whether TASI gave MBank Dallas telephone notice of the return on February 7th, it is undisputed that the check was not physically returned to MBank Dallas on February 7th. The check was misrouted by TASI; rather than returning the check to MBank Dallas, TASI sent the check to RepublicBank. After the check was misrouted to RepublicBank, it appears that RepublicBank sent the check to the Federal Reserve Bank of Dallas. On February 14th, TASI received telephone notification from the Federal Reserve Bank that it had the check and was sending it back. The return item department of TASI physically received the check on February 15th, and on that same date telephoned MBank Dallas notifying them of the return of the check. Because of an intervening bank holiday, MBank Dallas did not receive the check itself until February 19th. However, on February 15th, MBank notified Worthen Bank of the return by telephone. MBank sent the check to Worthen on February 19th and Worthen received it on February 21st. Worthen notified Pulaski by telephone on February 22nd that the check was being returned and Pulaski actually received the check from Worthen on February 23rd.

On February 22nd and 23rd, the balance in Lab Management's checking account at Pulaski was $46,036.65. Pulaski did not freeze the account at that time because it

considered the return to be late. It was Pulaski's position that since this was a late return, one of the collecting banks would be required to pay the entire amount of the check. Pulaski sent a late return claim to Worthen. Worthen disclaimed responsibility for the late return, and made a late return claim against MBank Dallas. MBank also disclaimed responsibility, and sent a late return claim to TAB/Fort Worth. TAB/Fort Worth also disclaimed responsibility, relying upon telephonic notice to MBank on February 7th. By March 25th, all of the banks in the collection chain had disclaimed, in writing, liability for late return. The Lab Management account was finally frozen and the $150,000 deposit charged back on April 30, 1985. At that time, the account balance was $1,433.99.

If the check had been returned timely by all the banks in the collection chain, Pulaski should have received notification of dishonor on February 12th. By February 12th, Pulaski had paid out $95,761.21 from the Lab Management account. Between February 12th, the date upon which Pulaski should have received notice of dishonor, and February 23rd, the date upon which the check was returned unpaid, Pulaski paid out $8,202.14 from the Lab Management account.

### TRIAL COURT FINDINGS AND CONCLUSIONS

The majority of the evidence in this case was undisputed. One disputed area was the relationship of TAB/Fort Worth and TAB/West Side, complicated by their joint use of TASI as agent. Based upon the foregoing evidence, the trial court made the following findings relevant to the interaction of TAB/West Side, TAB/Fort Worth and TASI:

8. On February 6, 1985, MBank Fort Worth sent the check for collection to Defendant Texas American Bank/Fort Worth, N.A. ("TAB/Fort Worth") by delivering it to Defendant Texas American Services, Inc. ("TASI"). TASI, acting as agent for TAB/Fort Worth, received the Check on February 6, 1985.

\*    \*    \*    \*    \*    \*

10. The Check was presented to TAB/West Side on February 6, 1985 by TASI acting as agent for TAB/Fort Worth. During this process the Check did not physically leave the premises of TASI.

11. By 8:15 a.m. on Thursday, February 7, 1985 in the normal and customary course of business, TAB/West Side received from TASI, acting as agent for TAB/Fort Worth and TAB/West Side, a Rejected Items Report listing checks drawn on TAB/West Side accounts in which there were insufficient funds to cover the checks. The Check was on that report.

\*    \*    \*    \*    \*    \*

13. On the morning of February 7, 1985, TAB/West Side notified TASI of TAB/West Side's decision to dishonor the Check by returning the Rejected Items Report to TASI with no notation to pay the Check. It was the practice for a notation of "pay" to be made next to checks on the report that TAB/West Side decided to pay. The absence of a "pay" notation means the item should not be paid. TASI was acting as agent for TAB/West Side in receiving that notice. TASI, acting as agent for TAB/Fort Worth, accepted the notice on behalf of TAB/Fort Worth. The provisional debits and credits of February 6, were then reversed on the accounts between the TAB banks.

14. The notices of dishonor from TAB/West Side to TAB/Fort Worth was given prior to midnight of the day following presentation (the "midnight deadline") pursuant to Section 4.301 of the Texas Business and Commerce Code (the "TBCC"). Accordingly, TAB/West Side returned the Check to TAB/Fort Worth, its immediate transferor, within the midnight deadline of the TBCC, which was a timely return.

15. After the debit and credit entries were reversed, the Check was pulled and routed to Julie Moon in TASI's Return Item Department on February 7 for notification and return to MBank Dallas. On February 7, 1985, Ms. Moon misrouted

the Check to Republic National Bank of Dallas (which had not endorsed the Check) instead of to MBank Dallas. Ms. Moon was acting exclusively for TAB/Fort Worth—not TAB/West Side—when she misrouted the Check.

16. The misrouting of the Check was a failure by TAB/Fort Worth to use ordinary care in returning the Check. Section 4.202(a)(2) TBCC.

The trial court filed the following conclusions of law relating to the relationship of TAB/West Side, TAB/Fort Worth and TASI:

1. TAB/Fort Worth was a collecting bank as defined in Section 4–105(4) of the TBCC with respect to the processing of the Check.

\*   \*   \*   \*   \*   \*

5. TAB/West Side was a payor bank as defined in Section 4–105(b) of the TBCC with respect to the processing of the Check.

6. TAB/Fort Worth was TAB/West Side's transferor with respect to the Check as that term is used in the TBCC.

7. TASI is not a bank as defined in Section 1–201(4) of the TBCC.

8. TAB/West Side returned the Check to TAB/Fort Worth within the midnight deadline of the TBCC, which was a timely return.

\*   \*   \*   \*   \*   \*

10. At no time did TAB/Fort Worth act as agent of TAB/West Side in any respect, including the processing, collection and return of the Check.

11. Delivery, as used in Section 4.301 of the TBCC, does not require physical delivery of the Check itself from TAB/West Side's banking premises to TAB/Fort Worth's banking premises because, to speed and facilitate clearing of items, the check remains at TASI as the processing agent for both banks.

12. MBank Dallas and TAB/West Side used ordinary care at all times in processing and returning the Check and in giving notice of its return.

\*   \*   \*   \*   \*   \*

14. TAB/West Side, MBank Dallas and TASI are not liable to Pulaski for any sum.

15. TAB/Fort Worth is liable to Pulaski for the sum of $8,202.14 plus pre-judgment interest at the rate of 6% per annum from April 12, 1985 through the date of judgment. April 12, 1985 is thirty days following TAB/Fort Worth's written disclaimer of liability for the late return.

The only other matter in dispute in this appeal is the appropriate measure of damages if TAB/Fort Worth is liable as found by the trial court. The following findings are relevant to that issue:

30. By failing to freeze the Lab Management account or charge the Check back to that account on February 22, 1985 (when it received telephone notice that the Check was being returned for insufficient funds) or on February 23, 1985 (when the returned check was actually received by Pulaski) Pulaski did not use ordinary care. This negligence was a proximate cause of Pulaski's loss to the extent of $46,036.65, the amount in the account on February 22 and 23.

31. If on February 6, 1985, TAB/Fort Worth had not misrouted the Check or had given wire notice to MBank Dallas of the return, Pulaski would have received wire notice of dishonor of the Check in the normal course of business on February 12, 1985. The opening balance in Lab Management's account earliest on that date was $54,238.79.

32. Pulaski paid three checks on Lab Management's account on and between the date Pulaski would have received notice of return of the Check (February 12) and the dates Pulaski received actual notice of return (February 22) and physical return (February 23). The three checks paid on or between those dates totalled $8,202.14.

33. The sum of $8,202.14 is the amount of Pulaski's loss caused by the failure of TAB/Fort Worth to exercise ordinary care in returning the Check to MBank Dallas in a timely manner. This sum of $8,202.14 is the amount of the Check

reduced by an amount which could not have been realized by the use of ordinary care, i.e., the measure of liability for a collecting bank set forth in Section 4.103(e) of the TBCC. This is the maximum extent of TAB/Fort Worth's liability to Pulaski even if Pulaski's failure to immediately freeze the account or charge the Check back to the account were not considered negligence.

34. All sums paid out against the immediate credit provided by Pulaski to Lab Management before February 12, 1985 would have been paid out even if TAB/Fort Worth had not misrouted the Check and had given telephone notice of the return. The amount so paid out was $85,761.21.

The trial court also reached the following conclusion of law:

13. Expert testimony was not necessary to establish the standard of care that Pulaski should have exercised once it was notified that the Check was being returned for insufficient funds.

### LIABILITY OF TAB/WEST SIDE

Pulaski contends in its first point of error that "[t]he trial court should have found as a matter of law that TAB West Side was liable for Pulaski Bank's loss because it did not timely and adequately revoke settlement and return the check." Pulaski concedes that the U.C.C. does not require TAB/West Side to return directly to Pulaski, but rather requires a return to its immediate transferor before the midnight deadline. *See* § 4.301. Pulaski contends, however, that MBank, not TAB/Fort Worth, was TAB/West Side's transferor. Pulaski characterizes TAB/Fort Worth as a "mere agent" of TAB/West Side and a "nominal participant" in the check-handling process. Thus, argues Pulaski, a return to TAB/Fort Worth before TAB/West Side's midnight deadline was ineffective to cut off TAB/West Side's liability.

In the alternative, Pulaski contends that, even if TAB/Fort Worth is the transferor bank, we would frustrate the public policy behind the enactment of chapter 4 of the U.C.C. if we held that return and revocation of provisional settlements can be achieved through "mere" book entries at TASI. This presents an issue of first impression in this state, and apparently in all jurisdictions that have adopted the U.C.C. Further, in the event these arguments are unavailing, and we conclude TAB/West Side correctly and timely returned the check to its transferor as required by the U.C.C., Pulaski argues that the return was untimely under the rules of the Fort Worth Clearinghouse and thus, subjects TAB/West Side to liability.

### A. TAB/West Side's Midnight Deadline

■ We must first determine when TAB/West Side's midnight deadline fell. The midnight deadline falls on midnight on the next banking day following the banking day on which TAB/West Side received the check. *See* § 4.104(a)(8). The $150,000 check reached TASI on February 6th. It is undisputed that TASI functions as the data-processing center for both TAB/Fort Worth and TAB/West Side. It is also undisputed that the check remained at TASI February 6th and 7th and that TAB/West Side's decision to dishonor was not made until February 7th. We need not decide yet whether the delivery of the check to TASI was delivery to TAB/West Side directly or to TAB/West Side only through delivery first to TAB/Fort Worth. TAB/West Side and TAB/Fort Worth concede that, in some fashion, TAB/West Side received the check at TASI at some time on February 6th. This Court has held that the midnight deadline calculation begins with the day on which a check is received at an off-premises data-processing center and not the day on which the check or check information is taken to the bank premises from the data-processing center. *First State Bank of McKinney*, 732 S.W.2d at 406–07.

Thus, we conclude that the midnight deadline time period must be calculated starting with February 6th, the day TAB/West Side "received" the check by presentment to TASI (Whether that presentment was made by MBank or by TAB/Fort Worth will be addressed later). Therefore, TAB/West Side's midnight

deadline was midnight of the next banking day. *See* § 4.104(a)(8). By midnight of February 7th, TAB/West Side had to return the check to its transferor bank. We must now determine the identity of that transferor bank.

### B. *TAB/Fort Worth's Status As TAB/West Side's Transferor Bank*

■ Pulaski argues that TAB/Fort Worth was acting merely as an agent for presentment of the check and not as a collecting bank. The essence of its argument is that TAB/Fort Worth was involved with this check only because the Fort Worth Clearinghouse rules prohibited TAB/West Side from directly clearing the check. Pulaski alludes to the close relationship between TAB/Fort Worth, TAB/West Side and TASI as proof that TAB/Fort Worth was merely acting as agent for TAB/West Side. We are not persuaded by Pulaski's argument.

Pulaski relies in part on clearinghouse rule 2.03, which provides that a clearing member acts as agent or subagent for the bank for which the clearing member sends or receives items. We do not read this rule to change TAB/Fort Worth's status from a collecting bank to a mere agent. Even the U.C.C. provides that collecting banks are agents. *See* § 4.201. Because of the similarity in language of clearinghouse rule 2.03 and section 4.201 of the U.C.C., we believe that the clearinghouse rule was enacted for the same reason that section 4.201 was enacted: to end confusion over whether a bank handling an item was a purchaser of the item or merely an agent for collection. *See* § 4.201 comment 1. Thus, we conclude that any agency status between TAB/West Side and TAB/Fort Worth does not prevent TAB/Fort Worth from being TAB/West Side's transferor bank.

■ Pulaski also argues that the corporate relationship between TAB/West Side, TAB/Fort Worth and TASI prevents TAB/Fort Worth from being the transferor bank. TAB/West Side, TAB/Fort Worth and TASI are each separate corporate enti-

ties; however, they are all wholly-owned subsidiaries of Texas American Bancshares, Inc. Pulaski argues that this close relationship requires us to view TAB/West Side and TAB/Fort Worth as a single entity, disqualifying TAB/Fort Worth from being TAB/West Side's transferor bank.

We note that Pulaski has asserted no grounds justifying the disregarding of corporate status. Under Texas law, the separate identity of corporations will be observed by the courts, even in instances where one may dominate or control the other, or may even treat it as a mere department, instrumentality or agency of the other. *Norton v. Integral Corp.*, 584 S.W. 2d 932, 935 (Tex.Civ.App.—Austin 1979, no writ). The mere fact that a subsidiary is wholly owned by a parent corporation does not justify disregarding the corporate identity of the parent. *Texas Oil & Gas Corp. v. Hagen*, 683 S.W.2d 24, 28 (Tex.App.—Texarkana 1984, writ granted) (dismissal of writ of error pending approval of settlement agreement). *See also Lucas v. Texas Industries, Inc.*, 696 S.W.2d 372, 374–75 (Tex.1984). We decline to accept Pulaski's argument, unfounded in Texas law, that the joint ownership of TAB/Fort Worth and TAB/West Side prevents TAB/Fort Worth from being TAB/West Side's transferor bank.

■ Nevertheless, Pulaski contends that, as a matter of law, TAB/Fort Worth was not the immediate transferor of the check to TAB/West Side. A "matter of law" point is a form of "no evidence" point. As explained by Justice Cornelius:

When the complaining party's opponent had the burden on the issue, the point raising legal insufficiency is properly styled "no evidence." When the complaining party had the burden on the issue and it was answered adversely, the point should be styled as a "matter of law" point, because the fact finder's failure to find a fact need not be supported by evidence. The only time such a failure can be error is when the fact has been established conclusively or as a matter of law.

Cornelius, *Appellate Review of Sufficiency of the Evidence Challenges in Civil and Criminal Cases*, 46 TEX. B.J. 439, 440 (1983). The initial review of a "matter of law" challenge is the same as that required for a "no evidence" challenge. Thus, we must examine the record for evidence supporting the fact findings, while ignoring all evidence to the contrary. *Holley v. Watts*, 629 S.W.2d 694, 696 (Tex.1982). If there is no evidence to support the fact finder's answer, we must then review the entire record to see if the contrary proposition is established as a matter of law. *Holley*, 629 S.W.2d at 696; *Texas & N.O.R. Co. v. Burden*, 146 Tex. 109, 121, 203 S.W.2d 522, 528 (1947).

After reviewing the record, we are constrained to hold that there is ample evidence to support the trial court's finding that TAB/Fort Worth was TAB/West Side's transferor with respect to the $150,000 check. TAB/Fort Worth was authorized by Fort Worth Clearinghouse rules to clear checks for TAB/West Side. TAB/West Side, as an associate member, could not have received the check through the clearinghouse from MBank Fort Worth. TAB/Fort Worth, like any collecting bank, stamped the check with its endorsement. Transferor banks carry accounts for the next bank in the collection chain and will debit the account when it passes the check to that bank. In this case, TAB/Fort Worth carries an account for TAB/West Side. After the check was received at TASI and sorted to TAB/West Side, TAB/Fort Worth charged TAB/West Side's account for the amount of the check. After TAB/West Side notified TASI of its decision to dishonor the check, the ledger entries debiting TAB/West Side's account with TAB/Fort Worth were reversed. These actions are consistent with the relationship of transferor-transferee bank.

We hold that there is some evidence to support the trial court's finding. In light of this conclusion, we need not reach the question of whether the contrary proposition is conclusively established. *See Holley*, 629 S.W.2d at 697.

## C. *Public Policy*

Pulaski argues that one of the underlying policies of chapter 4 of the U.C.C. is speed in the collection process. Pulaski contends that we would frustrate this policy encouraging speed if we approved the "legal fiction" of allowing returns and revocations "within the confines of the same data processing center." Pulaski does not explain why it feels speed in collection would suffer by joint use of a data processing center. Its argument appears to be that a bank could extend its midnight deadline by "pretending" that another bank, which shared the data processing center, was involved in the collection chain. Thus, a bank could effectively double the amount of time that the U.C.C. gives it to act.

Pulaski cites numerous cases from other jurisdictions which it contends support the conclusion that the midnight deadline cannot be extended through joint use of a data processing center by a transferor collecting bank and a transferee payor bank. *See, e.g., Farmers and Merchant's Bank of Long Beach v. Bank of America National Trust and Savings Association*, 98 Cal. Rptr. 381, 20 Cal.App.3d 939 (1971); *North Carolina National Bank v. Harwell*, 38 N.C.App. 190, 247 S.E.2d 720, 25 UCC Rep. 225 (1978); *South Sound National Bank v. First Interstate Bank*, 65 Or.App. 553, 672 P.2d 1194, 37 UCC Rep. 1219 (1983); *South Sound National Bank v. Citizens Valley Bank*, 65 Or.App. 562, 672 P.2d 1198, 37 UCC Rep. 1225 (1983); *Central Bank of Alabama v. Peoples National Bank*, 401 So.2d 14, 31 UCC Rep. 1428 (Ala.1981); *Chrysler Credit Corp. v. First National Bank & Trust Co. of Washington*, 582 F.Supp. 1436, 38 UCC Rep. 401 (W.D.Pa.1984), *aff'd*, 746 F.2d 200, 39 UCC Rep. 967 (3d Cir.1984). However, none of the cases cited by Pulaski involved the joint use of a data processing center. The issue in the cases relied upon by Pulaski was when the midnight deadline commenced in a situation where a check was presented at a bank's off-premises data processing center. That issue has already been resolved for this jurisdiction in *First State Bank of McKinney*, 732 S.W.2d at 406–07. Pulaski has not presented any authority directly on

point. Pulaski relies heavily upon *Capital City First National Bank v. Lewis State Bank*, 341 So.2d 1025 (Fla.App.1977), which it claims is factually similar to the case at bar. Pulaski is correct, in that the payor bank's off-premises data processing center was a collecting bank's computerized proof and transit department. However, the issue in *Capital City* was when the midnight deadline commenced, not when the check was returned to the transferor bank. Thus, we have been presented with no case authority to support Pulaski's public policy argument.

This court has recognized that speed in the collection process is a policy encouraged by the U.C.C. *See First State Bank of McKinney*, 732 S.W.2d at 406. There is, however, a competing interest that we must recognize. A bank must be given sufficient time in which to make an informed, intelligent decision whether to pay a check or to dishonor it. The framers of the U.C.C. recognized this time-consuming process:

> After an item has been received by a bank it goes through a series of processes varying with the type of item that it is. It moves from the teller's window, branch office, or mail desk at which it is received through settlement and proving departments until it is forwarded or presented to a clearing house or another bank, if it is a transit item, or until it reaches the bookkeeping department, if the bank receiving it is the payor bank. In addition, in order that the books of the bank always remain in balance while items are moving through it, the amount of each item is included in lists or proofs of debits or credits several times as it progresses through the bank. The running of proofs, the making of debit and credit entries in subsidiary and general ledgers and the striking of a general balance for each day requires a considerable amount of time.

*See* § 4.107 comment 1. While we agree with Pulaski that it would be unfair to allow a bank, through use of a sham transferor bank, to double its midnight deadline, it would be equally unfair to halve the time by requiring separate banks to share the same midnight deadline.

The Code recognizes that each bank is entitled to at least twenty-four hours to process a check. *See* § 4.104(a)(8). Even closely-related banks have this right; the U.C.C. provides that each branch or separate office of a bank is to be considered a separate bank for purposes of computing the time in which a bank is to act. *See* § 4.106. Thus in *Lawrence v. Bank of America*, 163 Cal.App.3d 431, 209 Cal.Rptr. 541 (1985), one branch bank was allowed, after cashing a check, an event which would render payment final if taken by a payor bank, to revoke a provisional settlement on a check drawn on another branch of the bank, even though both branches were linked by a common computer system. The branches, despite the shared computer system, were considered separate entities under section 4.106.

After weighing the competing interests of the U.C.C., we conclude that TAB/Fort Worth and TAB/West Side must be treated as separate banking entities, each entitled to a separate midnight deadline despite the shared data-processing center. Pulaski argues in its brief:

> If the judgment is upheld, a payor bank, such as TAB West Side, could effectively emasculate its potential liability under [the U.C.C.] through legal fictions. In essence, a group of banks could each avoid their respective payor bank liabilities and midnight deadlines through the fiction of revocations of settlement and "returns" of checks within the confines of the same date processing center. Taken to a logical extreme, the banks might never be held strictly liable under [the U.C.C.] because of their internal "returns" and "revocations" at the data processing center.

The argument is, in the abstract, very persuasive. However, Pulaski offered no evidence at trial to indicate that TAB/West Side used TASI in order to insulate it from liability. As stated previously, the evidence showed that TAB/Fort Worth and TAB/West Side had a true transferor-

transferee relationship and were not using TASI to perpetrate a fraud.

### D. TAB/West Side's Return of the Check to TAB/Fort Worth Before Its Midnight Deadline

As we noted previously, TAB/West Side's deadline for return of the check was midnight on February 7th. We have also held that the return had to be made to its transferor bank, which was TAB/Fort Worth. We turn now to the evidence to determine if TAB/West Side returned the $150,000 check to TAB/Fort Worth before midnight on February 7th. The evidence shows that TAB/West Side returned the rejects list with no "pay" notation next to the $150,000 check to TASI between 10:00 a.m. and 11:00 a.m. on February 7th. The lack of a "pay" notation informed TASI that TAB/West Side was returning the check unpaid. At TASI, the check was pulled and routed to the customer accounting department where the ledger entries between TAB/West Side and TAB/Fort Worth were reversed. From that department, the check was taken to the return items department. According to a TASI vice-president, the return between TAB/West Side and TAB/Fort Worth was completed when two events occurred: when the item was physically pulled and the ledger entries were reversed. This occurred before midnight on February 7th. We hold, based upon this evidence, that TAB/West Side met its U.C.C. midnight deadline for returning the check to TAB/Fort Worth.

### E. The Clearinghouse Rules

Pulaski's final argument is that, even if TAB/West Side timely returned the check under the U.C.C., the return was still untimely under the rules of the Fort Worth Clearinghouse. The U.C.C. provides that chapter 4 may be varied by agreements and that clearinghouse rules have the effect of agreements whether or not specifically assented to by all parties interested in items handled. *See* § 4.103(a) & (b). Further, section 4.213, which provides that a payor bank must return an item within a specified time or the settlement becomes final

and may not be revoked, sets out the time when the settlement becomes irrevocable and any return is rendered ineffective: when the payor bank has "made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, *clearing house rule* or agreement." *See* § 4.213(a)(3) (emphasis added). In *Lockhart Savings & Loan*, 720 S.W.2d 193, the Austin court of appeals held that the U.C.C. clearly provides that clearinghouse rules will determine final payment *when a clearinghouse was the vehicle for presentment. Id.* at 195–96. However, we have held that the Fort Worth Clearinghouse was not the vehicle for presentment to TAB/West Side. While the clearinghouse was the vehicle for presentment to TAB/Fort Worth, it was TAB/Fort Worth, and not the clearinghouse, which presented the check to TAB/West Side. Thus, TAB/West Side was not required to meet clearinghouse rules in returning the check to TAB/Fort Worth.

### F. Conclusion

We hold that TAB/West Side timely returned the $150,000 check to its transferor bank, TAB/Fort Worth. Accordingly, we conclude that the trial court was correct in finding that TAB/West Side was not liable for damages to Pulaski. Pulaski's first point of error is overruled.

### MEASURE OF DAMAGES

In its second point of error, Pulaski argues that the trial court used the wrong measure of damages owed by TAB/Fort Worth. The measure of damages for failure by a collecting bank like TAB/Fort Worth to exercise ordinary care in the return of the $150,000 check is "the amount of the item reduced by an amount which could not have been realized by the use of ordinary care." *See* § 4.103(e). Pulaski contends that this measure should be applied by subtracting from the amount of the item—$150,000—the amount paid out by Pulaski prior to February 12th, the date on which Pulaski should have received notice of return of the check—$95,761.21.

Thus, contends Pulaski, it was entitled to damages of $54,238.79. TAB/Fort Worth contends that the measure of damages set out in section 4.103(e) results in liability for checks paid out of the account between February 12th, the date Pulaski normally would have received notice of dishonor, and February 23rd, the date Pulaski received actual notice of dishonor. The checks paid in this ten-day window totaled $8,202.14. The trial court agreed with TAB/Fort Worth and entered judgment for Pulaski for $8,202.14.

Pulaski argues that the language of section 4.103(e) does not contemplate offsets for the allegedly negligent acts of Pulaski. We need not decide the scope of section 4.103(e) because even if Pulaski's argument is correct, Texas law recognizes the doctrine of avoidable consequences, or the duty to mitigate damages. An injured person cannot recover damages that do not result proximately from the tortfeasor's breach of duty and thus damages that might be avoided or mitigated are not recoverable. *Moulton v. Alamo Ambulance Service, Inc.*, 414 S.W.2d 444, 449 (Tex. 1967); *Gideon v. Johns–Manville Sales Corp.*, 761 F.2d 1129, 1139 (5th Cir.1985) (construing Texas law); RESTATEMENT (SECOND) OF TORTS § 918 (1979). The doctrine of mitigation of damages is supported by sound public policy. "[R]ecovery for the harm is denied because it is in part the result of the injured person's lack of care, and public policy requires that persons should be discouraged from wasting their resources, both physical or economic." RESTATEMENT (SECOND) OF TORTS § 918 comment a. *See also David H. v. Spring Branch Independent School District*, 569 F.Supp. 1324, 1340 (S.D.Tex.1983) ("a plaintiff cannot sit still and let damages pile up when reasonable steps would prevent further losses.")

■■■ Texas has applied the mitigation doctrine in both tort and breach of contract cases. *See Moulton*, 414 S.W.2d at 449 (tort case); *Copenhaver v. Berryman*, 602 S.W.2d 540, 544 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.) (breach of contract case). Mitigation of damages has also been considered in a case involving a contract governed by chapter 2 of the U.C.C. *See LTV Aerospace Corp. v. Bateman*, 492 S.W.2d 703 (Tex.Civ.App.—Tyler 1973, writ ref'd n.r.e.). Other jurisdictions have applied the mitigation doctrine in cases involving chapter 4 of the U.C.C. In *State & Savings Bank of Monticello v. Meeker*, 469 N.E.2d 55 (Ind.App. 1984), the Indiana court, in a case involving a payor bank's strict liability for the full amount of a late-returned item under section 4.302, reversed and remanded a summary judgment because of the existence of an unresolved fact issue concerning mitigation of damages. *Id.* at 59, *citing Met Frozen Food v. National Bank of North America*, 89 Misc.2d 1033, 393 N.Y.S.2d 643 (1977) and *Union Bank of Benton v. First National Bank*, 621 F.2d 790 (5th Cir. 1980) (applying Texas law). We hold that the doctrine of avoidable consequences, or mitigation of damages, applies in this case. The doctrine of avoidable consequences requires an injured party to use reasonable efforts to avoid or prevent losses. *See Fidelity & Deposit Co. of Maryland v. Stool*, 607 S.W.2d 17, 25 (Tex.Civ.App.—Tyler 1980, no writ). The doctrine is applicable only if the victim of the wrongdoer's act has knowledge of the fact which makes avoidance of the consequences necessary, and if the damages can be avoided with only slight expense and reasonable effort. *Trinity Universal Ins. Co. v. Fuller*, 524 S.W.2d 335, 338 (Tex.Civ.App.—Dallas 1975, writ ref'd n.r.e.).

■■■ At the time Pulaski officials received the belated notice of dishonor and returned check on February 23rd, there was $46,036.65 in the Lab Management account. Theresa Edwards, assistant vice-president in charge of customer service, and Jim Fincher, senior vice-president and account officer for Lab Management, knew about the return on February 23rd and each had the authority to freeze the Lab Management account at that time. Edwards testified by deposition that she did not freeze the account because the check was a late return item that some bank in the collection chain rather than her customer should pay. Fincher testified by deposi-

tion that he honestly did not know why he did not freeze the account on February 23rd. In retrospect, he testified, he wished he had frozen the account. If he had, he stated, it would have saved some money and saved a lot of people a lot of grief.

We conclude that Pulaski could have mitigated damage with only minimal effort by freezing the Lab Management account when Pulaski learned that the check had not been paid. Pulaski argues, however, that there was no expert testimony of a banker's standard of care when an item is returned for insufficient funds. TAB/Fort Worth argues, and the trial court concluded, that expert testimony was not necessary to establish the standard of care. The mitigation standard is that of ordinary care—what an ordinary prudent person would do in the same or similar circumstances. *Moulton*, 414 S.W.2d at 447. Pulaski cites *Hood v. Phillips*, 554 S.W.2d 160 (Tex.1977), for the proposition that expert testimony is required to establish what a reasonable banker would do when faced with the late return of a $150,000 check for insufficient funds. In *Hood*, a medical malpractice case, the supreme court recognized that expert testimony was required to establish a physician's standard of care "[u]nless the mode or form of treatment is a matter of common knowledge or is within the experience of the layman." *Hood*, 554 S.W.2d at 165–66.

In this case, we conclude that the propriety of freezing the account to prevent the withdrawal of $46,036.65 in uncollected funds is a matter of common knowledge or within the experience of the layman. It takes no special expertise to discern that it was unwise to allow Lab Management to continue to withdraw money that did not belong to it. Even if expert testimony was necessary to establish a banker's standard of care, we conclude that the testimony of Fincher, who had been in the banking business for fifteen years and was, at the time of trial, a bank president, was sufficient to establish the standard of care.

We hold that Pulaski cannot recover the $46,036.65 attributable to its failure to mitigate. Pulaski concedes that it cannot re-

cover the $95,761.21 it paid out prior to February 11th. Thus, TAB/Fort Worth is liable only for the $8,202.14 that is attributable to its failure to exercise ordinary care. The trial court correctly entered judgment for Pulaski for $8,202.14. Point of error two is overruled.

### ATTORNEY'S FEES

In point of error three, Pulaski contends that the trial court erred in refusing to award attorney's fees. Pulaski argues that it is entitled to recover attorney's fees because it recovered from TAB/Fort Worth on a contract claim. Unless provided for by statute or by contract between the parties, attorney's fees are not recoverable against an adversary either in an action in tort or a suit upon a contract. *New Amsterdam Casualty Co. v. Texas Industries, Inc.*, 414 S.W.2d 914, 915 (Tex. 1967); *Tibbetts v. Tibbetts*, 679 S.W.2d 152, 154 (Tex.App.—Dallas 1984, no writ); *Jernigan v. Jernigan*, 677 S.W.2d 137, 141 (Tex.App.—Dallas 1984, no writ).

Pulaski avers that section 38.001 of the Civil Practice and Remedies Code authorizes the award of attorney's fees in this case. That section provides:

A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for:

\*　　\*　　\*　　\*　　\*　　\*

(8) an oral or written contract.

TEX.CIV.PRAC. & REM.CODE ANN. § 38.001 (Vernon 1986). Pulaski argues that the check is a contract, relying upon *Barham v. Sugar Creek National Bank*, 612 S.W.2d 78, 80 (Tex.Civ.App.—Houston [14th Dist.] 1981, no writ). *Barham* involved a suit by a bank against its customer. Barham deposited a check drawn by another upon a third-party bank into his account at Sugar Creek National Bank. The bank gave Barham immediate credit and he immediately withdrew all of the money. When payment was stopped, the bank sued Barham to recover the money withdrawn. The court held that Barham's endorsement of the check was a promise to pay the holder or subsequent endorser in

the event the check was dishonored. Thus, the endorsed check constituted a written contract.

*Barham* is not relevant in the case at bar. Pulaski is not suing TAB/Fort Worth on its endorsement, nor is Pulaski suing Lab Management for the funds. A review of Pulaski's second amended original petition reveals that Pulaski sued TAB/Fort Worth for its failure to meet its midnight deadline and for failing to use ordinary care in returning the check.

We conclude that a suit for late return of an item under section 4.302 is not a suit to recover on the instrument itself. Instead, it is a suit to recover for the wrongful or negligent manner in which the bank handled the instrument. In other words, the action is a tort claim and not a contract claim for which section 38.001 authorizes the recovery of attorney's fees. *See Idah Best, Inc. v. First Security Bank of Idaho, N.A., Hailey Branch,* 99 Idaho 517, 584 P.2d 1242, 1253 (1978); *Goodman v. Norman Bank of Commerce,* 565 P.2d 372, 374 (Okla.1977). Point of error three is overruled.

Having overruled Pulaski's three points of error, we affirm the judgment of the trial court.