**FIRST STATE BANK OF McKINNEY, Texas, Appellant,**

v.

**AMERICAN BANK OF SHERMAN, N.A., Appellee.**

No. 05–86–00804–CV.

Court of Appeals of Texas, Dallas.

June 4, 1987.

John R. Stooksberry, McKinney, for appellant.

John D. Hill, Sherman, for appellee.

Before HOWELL, McCLUNG and McCRAW, JJ.

McCLUNG, Justice.

First State Bank of McKinney, Texas (First State) sued American Bank of Sherman, N.A. (American) alleging late return of two checks in breach of American's statutory duty under section 4.302[1] of the Texas Business and Commerce Code (Tex.U.C.C.). The trial court held that American timely returned the checks. We disagree. Consequently, we reverse and render judgment for First State.

On March 29, 1982, Donald K. McKinney, a customer of both banks in this litigation, gave First State two checks, one to pay off a debt and the other to buy a certificate of deposit (CD). In the same transaction, First State released security for the debt and delivered the CD to McKinney. The checks were drawn on McKinney's account with American.

Following normal procedures, First State delivered the checks to the Federal Reserve Bank of Dallas (Federal Reserve) for collection. After the checks were processed by the Federal Reserve, they were delivered to Affiliated Computer Systems, Inc. (Affiliated) in Dallas. Affiliated received the checks on March 30, 1982.

American had contracted with Affiliated to provide data processing services, which included maintenance of customer accounts.[2] American had the capability to access the data in Affiliated's computer through terminals on American's premises connected to the Affiliated computer by telecommunications equipment and circuits. A large number of other banks also utilized similar data processing services of Affiliated.

A daily report of all transactions, along with the processed checks that went into the compilation of that report, was made available to American each morning. This report included the net account balance of

---

1. Unless otherwise indicated, all sections will refer to the Texas Business and Commerce Code.

2. We note that paragraph 1.F. of the contract provides that American is "responsible for transporting to and from [American], the Federal Reserve or clearing house, and [Affiliated's computer] (i) all data and information [needed] for [Affiliated] to perform services required by this Agreement, and (ii) all reports provided by [Affiliated] hereunder. Items to be processed for daily reports shall be delivered to [Affiliated] by 7:00 p.m. and [Affiliated] shall have daily reports available for pickup by [American] at [Affiliated] by 7:00 a.m. the next business day.

American's customers' accounts after payment of any checks issued on those accounts. In the event that an account did not have a sufficient balance to cover a given check, that check was put on the "cuts list" of the daily report prepared for that day. The checks at issue here were placed on the "cuts list" and delivered to American on March 31, 1982. On that same day, American decided to honor the two checks at issue, and made all the appropriate bookkeeping entries to reflect the overdraft which was thereby created in McKinney's account. The following day, April 1, 1982, American reversed its decision of the previous day and notified First State by phone that the checks would be dishonored.

In summary:

| Date | Action |
| --- | --- |
| 3/29/82 | Checks written and delivered. First State delivers CD, releases lien. Checks sent to Federal Reserve. |
| 3/30/82 | Checks delivered to Affiliated. Checks put on cuts list. |
| 3/31/82 | Checks delivered to American. American decides to honor them. |
| 4/01/82 | American notifies First State of dishonor. |

First State asserts that under these facts, American failed to notify it timely under section 4.302 and is therefore accountable for the checks. The provision is set forth below:

### § 4.302. Payor Bank's Responsibility for Late Return of Item

In the absence of a valid defense such as breach of a presentment warranty (Subsection (a) of Section 4.207), settlement effected or the like, if an item is presented on and received by a payor bank the bank is accountable for the amount of

(1) a demand item other than a documentary draft whether properly payable or not if the bank, in any case where it is not also the depository bank, retains the items beyond midnight of the banking day of receipt without settling for it or, regardless of whether it is also the depository bank, does not pay or return the item or send notice of dishonor until after its midnight deadline; or

(2) any other properly payable item unless within the time allowed for acceptance or payment of that item the bank either accepts or pays the item or returns it and accompanying documents.

Midnight deadline is "midnight on its next banking day following the banking day on which it receives the relevant item . . . ." Section 4.104(a)(8).

The midnight deadline began to run here when the item was "presented on and received by" American. First State asserts that the midnight deadline began to run when Affiliated received the checks. American contends that the midnight deadline should not begin to run until the check arrives at the bank premises. The question of whether the midnight deadline begins to run when a check is received by an off-premise processing center or by the bank itself has not been addressed in Texas. However, the question has been addressed in other jurisdictions:[3,4] *Farmers and Merchants Bank of Long Beach v. Bank of America National Trust and Savings Assoc.,* 20 Cal.App.3d 939, 98 Cal.Rptr. 381 (1971); *Capitol City First Nat'l Bank v. Lewis State Bank,* 341 So.2d 1025 (Fla. App.1977), *cert. denied,* 357 So.2d 186 (Fla. 1978); *North Carolina Nat'l Bank v. Harwell,* 247 S.E.2d 720 (N.C.App.1978); *Idah-Best, Inc. v. First Security Bank of Idaho, N.A., Hailey Branch,* 99 Idaho 517, 584 P.2d 1242 (1978); *Go-Tane Service Stations, Inc. v. Sharp,* 78 Ill.App.2d 785, 33 Ill.Dec. 916, 397 N.E.2d 249 (1979); *Catalina Yachts v. Old Colony Bank,* 497 F.Supp. 1227 (D.Mass.1980); *Central Bank of Alabama, N.A. v. Peoples National Bank of Huntsville,* 401 So.2d 14 (Ala. 1981); *Bon Bon Productions, Ltd. v. Xanadu Productions, Inc.,* 32 U.C.C.Rptr. 253 (D.Mass.1981); *South Sound Nat'l Bank v. First Interstate Bank,* 672 P.2d 1194 (Or.Ct.App.1983); *Chrysler Credit*

---

**3.** Some cases have been decided under the midnight deadline in the context of section 4.301 governing delayed posting of items.

**4.** The California case is based on a pre–U.C.C. statute which was couched in terms of "business" days rather than "banking" days.

*Corp. v. First National Bank and Trust Company of Washington,* 746 F.2d 200 (3rd Cir.1984) (applying Pennsylvania law). The majority rule is that the deadline begins to run when the check is received by the processor.

The cases supporting American's position do so for several reasons, none of which we find persuasive. One reason given is that under section 4.106, "[a] branch or separate office of a bank is a separate bank for the purpose of computing the time within which and determining the place at or to which action may be taken or notices or orders shall be given...." American cannot seriously argue that Affiliated is a separate bank because its only function was to provide data processing services. Compare this to the situation in *Catalina Yachts.*

The payor bank in *Catalina Yachts* was not a member of the Federal Reserve. It entered into an agreement with a member bank and the Federal Reserve specifying how checks would be processed. The agreement allowed the Federal Reserve to settle the non-member checks by charging the member bank's account. The member bank in turn charged an account maintained at the member bank by the non-member bank. *Catalina Yachts,* 497 F.Supp. at 1230. The agreement further specified that the day of receipt by the non-member bank was the next business day after the checks were delivered to the member bank. *Id.* at 1234. Under these circumstances, clearly inapplicable here, the court held that the midnight deadline should not begin when the non-member bank's checks were received by the member bank processor.

Another reason sometimes given for not triggering the midnight deadline upon receipt by the processing center is that to do so would discourage off-premise processing and ultimately reduce the efficiency of the banking system. *Bon Bon Productions,*

32 U.C.C.Rptr. at 257. We disagree with this reasoning. Strict enforcement of the midnight deadline will encourage the use of off-premises processing if this arrangement is truly more efficient because more efficient processing will help banks meet the midnight deadline. On the other hand, if off-premises processing slows down check collection, then we should, with good reason, construe the law so as to discourage it.[5] Indeed, the statutory scheme emphasizes the importance of speed in the collection process. *New Ulm State Bank v. Brown,* 558 S.W.2d 20, 27 (Tex.Civ.App. —Houston [1st Dist.] 1977, no writ).

American asserts that it is unfair to start the midnight deadline before a bank has physical possession of the checks because only then can the decision be made whether to pay the check. For example, American asserts it has no way to know if the signature on a check is forged until it examines the check. First State argues that it would be unfair to allow a payor bank to unilaterally extend the midnight deadline; by manipulating the pick-up and delivery of checks a payor bank could theoretically extend the midnight deadline indefinitely.

We first note that neither consideration applies to this case. First State delivered the CD and released the loan security in the same transaction in which McKinney delivered the check. Equity does not favor First State for that reason; First State did not change its position as a result of American's delay.[6] On the other hand, American does not tell us, in this case, why it was prevented from returning or giving notice of dishonor on March 31st when it knew the checks could not be covered by funds in McKinney's account. Only after American discovered unrelated improprieties by McKinney did American decide to dishonor the checks and use the balance in McKinney's account to set off a loan to McKin-

---

5. For a case illustrating what can happen when check return is slow see *Northpark Nat'l Bank v. Bankers Trust Co.,* 572 F.Supp. 524 (S.D.N.Y. 1983). A swindler there was able to take advantage of delays in the check clearing system to fraudulently obtain about $60,000 from Northpark National Bank.

6. One commentator asserts that section 4.302 is a penalty which "should never be applied where there is no prior claim of credits firming up automatically upon a lapse of time." Hawkland, Leary & Alderman, U.C.C. Series § 4–302:01 (Art. 4 at 61).

ney. We see no equity in allowing a payor bank extra time to decide whether to take a set-off to the detriment of other creditors. Indeed, one commentator notes that section 4.302 is "especially necessary to prevent excessive favoritism of … the bank's own interest in taking a set-off in priority over presented items…." Hawkland, Leary & Alderman, U.C.C. Series § 4–302:01 (Art. 4 at 61). Finally, we note that the contract with Affiliated makes American responsible for all check transportation. Footnote 2, *supra.* If forgery were truly a concern, then American could first deliver the checks to its premises in Sherman for inspection before taking them to Affiliated for processing.

The result we reach is consistent with other evidence in the record and with Federal Reserve practices. The insufficient funds notice addressed to McKinney states that the checks were "presented" for payment on March 30, 1982. American's responses to First State's late return claims are Federal Reserve forms on which American certified that the check's were "received by us *or our processor*" on March 30, 1982 (emphasis added). We infer from this language that, as far as the Federal Reserve is concerned, receipt by Affiliated is tantamount to receipt by American. Our inference is supported by Federal Reserve policy, as expressed by Regulation J, which concerns check collection, that speed is important to the collection process: "The rules or practices of a clearing house through which the item was presented, or a special collection agreement under which the item was presented, may not extend [the midnight deadline], but may provide for a shorter return time." 12 C.F.R. § 210.12. We conclude, and so hold, that where a bank employs off-premises check processing the midnight deadline begins to run when the check is received by the processing center.

Reversed and rendered.