**TEXAS AMERICAN BANK/FARMERS BRANCH, Appellant,**

v.

**ABRAMS CENTRE NATIONAL BANK, Appellee.**

**No. 05–88–01317–CV.**

Court of Appeals of Texas, Dallas.

Sept. 25, 1989.

Rehearing Denied Nov. 13, 1989.

William B. Finkelstein, Jack F. Williams, Dallas, for appellant.

Kip M. Kugler, Dallas, for appellee.

Before WHITHAM, LAGARDE and KINKEADE, JJ.

OPINION

LAGARDE, Justice.

Texas American Bank/Farmers Branch (TAB) appeals from the trial court's take-nothing summary judgment entered in favor of Abrams Centre National Bank (Abrams). In a sole point of error, TAB asserts that the trial court erred, as a matter of law, in granting Abrams's motion for summary judgment and denying TAB's motion for summary judgment. We disagree and affirm the trial court's judgment.

The record in this case shows that four checks, drawn on Abrams, were given to TAB for payment on a letter of credit. After being processed by TAB, the checks were presented to MTech, Abrams's off-site data processing center, some time before 4:00 p.m. on Friday, August 15, 1986. The checks were processed through MTech and physically delivered to Abrams at 8:00 a.m. on Monday, August 18, 1986. An officer for Abrams, William E. Lowe, received the checks that morning, and, because there were insufficient funds in the drawer's account to pay the checks, Lowe telephoned the drawer. The drawer told Lowe that he would deposit funds to cover the checks by the end of the Monday banking day. The drawer never showed up, and Abrams made no effort to return the checks until 10:00 a.m. on August 19, 1986. With these facts in mind, we address TAB's point of error.

■ TAB claims that in this case the provisions of the Texas Business and Commerce Code (hereinafter Texas U.C.C.) that gov-

ern this type of transaction have been varied by contract. Abrams, on the other hand, claims that the express provisions of the Texas U.C.C. control. TAB concedes that if the Texas U.C.C. controls, it cannot prevail. Therefore, preliminarily, we will set out the applicable provisions of the Texas U.C.C. and, thereafter, we will examine TAB's theory of how the "contract" varies the terms of the Texas U.C.C.

## TEXAS U.C.C.

The Texas U.C.C. provides certain deadlines for the processing of checks. One such deadline requires a payor bank to return a check within a specified time limit; in pertinent part, it reads:

> (a) Where an authorized settlement or a demand item (other than a documentary draft) received by a payor bank otherwise than for immediate payment over the counter has been made before midnight of the banking day of receipt the payor bank may revoke the settlement and recover any payment if before it has made final payment (Subsection (a) of Section 4.213) and before its *midnight deadline* it
>
> (1) returns the item; or
>
> (2) sends written notice of dishonor or nonpayment if the item is held for protest or is otherwise unavailable for return.

TEX.BUS. & COM.CODE ANN. § 4.301(a) (Tex. U.C.C.) (Vernon 1968) (emphasis added). The Texas U.C.C. further provides a definition for "midnight deadline" which states: " 'Midnight deadline' with respect to a bank is midnight on its next banking day *following the banking day on which it receives the relevant item* or notice or from which the time for taking action commences to run, whichever is later." TEX. BUS. & COM.CODE ANN. § 4.104(a)(8) (Tex. U.C.C.) (Vernon 1968) (emphasis added); *see First State Bank of McKinney v. American Bank of Sherman,* 732 S.W.2d 404, 405 (Tex.App.—Dallas 1987, no writ).

The code defines banking day as "that part of any day on which a bank is open to the public for carrying on substantially all of its banking functions." TEX.BUS. & COM.CODE ANN. § 4.104(a)(3) (Tex. U.C.C.) (Vernon 1968). Applying the above definitions to section 4.301(a), that section provides that a payor bank must return or send notice of dishonor or nonpayment on the next banking day (*i.e.,* that part of any day on which a bank is open to the public for carrying on substantially all of its banking functions) *following the banking day on which it receives the relevant item. See* TEX.BUS. & COM.CODE ANN. §§ 4.104(a)(3), 4.104(a)(8), and 4.301(a) (Tex. U.C.C.) (Vernon 1968). A bank "receives" an item when it is delivered on a banking day to the bank's off-site data processing center.[1] *See Pulaski Bank & Trust v. Texas Am. Bank/Fort Worth,* 759 S.W.2d 723, 730 (Tex.App.—Dallas 1988, writ denied). If the item is not returned by midnight of the banking day following the banking day on which the bank receives the item, then the bank is strictly liable for payment of the item. *See Hamby Co. v. Seminole State Bank,* 652 S.W.2d 939, 941 (Tex.1983); TEX.BUS. & COM.CODE ANN. § 4.302 (Tex. U.C.C.) (Vernon 1968). This case specifically deals with when the midnight deadline for the return of the items actually began.

Abrams asserts, and TAB concedes, that, under the express provisions of the Texas U.C.C., the midnight deadline only begins to run when an item is received on "that part of any day on which a bank is open to the public for carrying on substantially all of its banking functions." In this case, the item would have to have been received by MTech (Abrams's off-site data processing center) by 3:00 p.m. Friday to be considered "received" during the Friday banking day.

TAB concedes that it cannot show that the checks were received prior to 3:00 p.m. Friday. Consequently, if the Texas U.C.C. applies, Abrams would have acted properly in treating the checks as received on Monday, instead of as received on Friday. By

---

**1.** In this case, the checks were delivered to MTech, Abrams's off-site data processing center, before 4:00 p.m. on Friday, August 15, 1986.

treating the checks as received on Monday, Abrams would not have been required to return the checks until midnight on Tuesday; therefore, its return by 10:00 a.m. on Tuesday, August 19, would have been timely. Thus, as TAB concedes, if the terms of the Texas U.C.C. apply, Abrams is not strictly liable for payment of the checks.

## TAB'S VARIANCE THEORY

However, arguing that the Dallas Clearing House Rules constitute a "contract," TAB asserts that, in this instance, the terms of the Texas U.C.C. have been varied by that contract. Specifically, TAB maintains that rule 7(a) of the clearing house rules varies section 4.104(a)(8) of the Texas U.C.C. In relevant part, rule 7(a) reads:

All members agree to have return items delivered to the DCHA office by 12:00 midnight of the first *business day following presentment.*

(Emphasis added.) TAB claims that the express language of rule 7(a) should be construed to mean "the first business day following *the business day* [2] *of* presentment." In essence, TAB is asking this court to rewrite rule 7(a) to add the words "the business day of" between the word "following" and the word "presentment."

TAB's interpretation of rule 7(a) and its definition of "business day" would vary the portion of Texas U.C.C. section 4.104(a)(8) which states:

'Midnight deadline' with respect to a bank is midnight on the next banking day following the *banking day on which it receives* the relevant item. . . .

(Emphasis added.) TAB's motivation for requesting this court to replace "banking day" with "business day" relates directly to TAB's definition of "business day," which, according to TAB, means anytime on Monday through Friday until 12:00 midnight. TAB's definition of "business day" differs from the 3:00 p.m. end of the Friday "banking day" by nine hours. If we were

to vary the terms of the Texas U.C.C. by substituting "business day" for "banking day" in section 4.104(a)(8), as TAB requests, the checks would have been presented in time to start the running of the midnight deadline on Friday, because the checks were delivered to Abrams's off-site data processing center prior to 12:00 midnight on Friday. Consequently, TAB asserts that under the "midnight deadline" provision of the Texas U.C.C., as varied by Dallas Clearing House Rule 7(a), Abrams would have been required to return the checks to TAB by midnight Monday, or suffer the consequence of being strictly liable for payment of the checks. Because Abrams did not return the checks by midnight on Monday, TAB argues that Abrams must pay TAB for the dishonored checks.

## CONCLUSION

In effect, TAB is asking this Court to conclude, as a matter of law, that the words *"the business day of"* should be read into clearing house rule 7(a), thereby varying the portion of section 4.104(a)(8) of the Texas U.C.C. that states *"the banking day on."* This court will only construe an agreement as a matter of law if the agreement is so worded that it can be given a certain or definite legal meaning or interpretation. *See Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983); *Compagna v. Lisotta,* 730 S.W.2d 382, 384 (Tex.App.—Dallas 1987, no writ); *MBank Dallas N.A. v. Sunbelt Mfg., Inc.,* 710 S.W.2d 633, 636 (Tex. App.—Dallas 1986, writ ref'd n.r.e.). We cannot construe the clearing house rule as *definitely* and *certainly* varying the terms of the Texas U.C.C.; nor will we infer that the phrase "the business day of" should be read into the clearing house rules to vary the express provision in section 4.104(a)(8) of the Texas U.C.C. stating "the banking day on."

At most, the clearing house rule is ambiguous and, thus, capable of raising a

---

**2.** Business day, according to TAB, means anytime prior to 12:00 midnight Monday through Friday. TAB admits that the Data Processing Service Agreement between MTech and Abrams

defines a "business day" as between 8:00 a.m. and 8:00 p.m. TAB implies, however, that the Data Processing Service Agreement definition does not apply in this context, and we agree.

question of fact.[3] However, TAB waived any claim of ambiguity by failing to plead the issue in the trial court; consequently, the issue of ambiguity cannot be considered as a ground for reversing the trial court's summary judgment and remanding the case to the trial court for a new trial. *See Bernard v. L.S.S. Corp.*, 532 S.W.2d 409, 411 (Tex.Civ.App.—Austin 1976, writ ref'd n.r.e.); *see, e.g., Sale v. Contran Corp.*, 486 S.W.2d 161, 165 (Tex.Civ.App.—Dallas 1972, writ ref'd n.r.e.). For these reasons, we must affirm the trial court's judgment.

WHITHAM, J., dissents.

WHITHAM, Justice, dissenting.

I respectfully dissent. The present case centers on whether four checks totaling $196,176.19 payable to the order of Texas American were returned in a timely fashion by Abrams Centre.

I begin with the odyssey of the checks. On August 14, 1986, four checks drawn on the Road Show, Inc. account with Abrams Centre were presented to Texas American as payments on a line of credit note obligation. The checks were transferred that same day to the off-premises data processor for Texas American, TASI. TASI processed the checks, ensuring that the checks were routed to the proper drawee institution. As part of its processing, TASI generated a bundle listing, also known as a cash letter listing of the checks it received from Texas American to MBank. TASI processed the checks on behalf of Texas American through Texas American Bank/Fort Worth and Texas American Bank/Dallas, affixing the stamp of both those banks to the back of the checks. The significance of the stamp indicates the date on which TASI processed the work on be-

half of Texas American/Dallas and Texas American/Fort Worth. At the time, both Texas American/Dallas and MBank were members of the Dallas clearing house, using the Dallas clearing house facility as a means to physically exchange checks and reach a net settlement with other member banks. Because MBank entered into an agreement with Abrams Centre to act as Abrams Centre's correspondent bank, MBank's account at the Federal Reserve Bank was debited for the amount of the checks drawn on Abrams Centre's account as part of its net settlement, as if the checks had been drawn on MBank. MBank's relationship with Abrams Centre is defined by a written agreement between the parties, executed January 17, 1984. Pursuant to that agreement, Abrams Centre agreed to accept checks through the Dallas clearing house or the Federal Reserve Bank which are drawn on it and to have MBank process and forward the checks to whomever Abrams Centre designated as its place of presentment. Through an oral agreement with MBank, Abrams Centre designated MTech as its place of presentment. The checks were exchanged through the Dallas clearing house by TASI and MBank at 11:00 a.m. on August 15, 1986. MBank began processing the checks shortly thereafter through an IBM 3890 reader/sorter machine. The machine read the microencoded information off the bottom of the checks. The information encoded on the check contains the routing and transit number, the bank's account number, and the dollar amount of the check. The routing and transit number identified the bank the check is drawn on. The process of having the microencoded information read by the reader/sorter is referred to as "capture." After the checks were captured, the computer created a printout of a list of all the processed

---

**3.** If TAB had pled ambiguity and the trial court had found that an ambiguity existed, the granting of Abrams's motion for summary judgment would have been improper because the interpretation of the instrument would have been a factual question for resolution by the trier of fact. *See Reilly v. Rangers Management Inc.*, 727 S.W.2d 527, 528–29 (Tex.1987); *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex.1983). Larry Hill, executive director of the North Texas

Clearing House, stated, in an affidavit, that business day also applied to presentment. However, this constitutes parol evidence, and absent a pleading of ambiguity, cannot be properly considered. *See Willow Bend Nat'l Bank v. Commonwealth Mortgage Corp.*, 722 S.W.2d 12, 14 (Tex.App.—Dallas 1986, writ ref'd n.r.e.); *Maxwell v. Lake*, 674 S.W.2d 795, 801 (Tex.App.—Dallas 1984, no writ).

checks. The listing, also known as a "cash letter," accompanied the checks to their payor bank or to their payor bank's designated agent. MBank printed its cash letter at 12:06 p.m. on August 15, 1986. Once the cash letter was printed, MBank attached it to the checks to be physically presented to MTech. Thereafter, the checks were delivered to MTech between approximately 1:30 and 3:30 p.m. on August 15, 1986. MTech provided data processing services for Abrams Centre pursuant to the terms of a written agreement entered into by the parties. Between 8:00 a.m. and 9:00 p.m. each day, MTech captured the work it received for MTech's customer banks from correspondent banks, such as MBank, and from the Federal Reserve Bank. The reader/sorter read the microencoded information on the checks. The computer created a file from the microencoded information for later use. The computer also created a listing of the information captured called a "50/50 prime list." The date and time on the prime list represented the time the report was printed. By 7:00 p.m. each evening, MTech began capturing the deposit work received that day by its customer banks, such as Abrams Centre. MTech captured all work received on behalf of its customers and processed it as that banking day's work, regardless of whether the work arrived before or after its customer's banking day cutoff. The checks in question were captured on Friday, August 15, 1986. After capture, MTech released the work into computer processing. The term "release" refers to a computer job which pulls all the information off the computer disk packs where it was previously stored and transfers the information into computer processing. Capture was completed at approximately 9:00 p.m. On August 15, 1986, the checks drawn on Abrams Centre's accounts were released into computer processing sometime between 9:25 p.m. and 10:50 p.m. Once the information was released, the computer applied the transaction information to the current account information, updating the books of its customer banks. At this time, the computer made bookkeeping entries and entered credits and debits to accounts which have sufficient account balances. The process of updating accounts and the application of debits and credits to current account balances is referred to as "posting." The majority of the checks were "regular," in that the account balances were sufficient, and a debit entry could be made against the account. Debit entries were not made by MTech against accounts when the check would cause the accounts to be overdrawn, or when the bank, for whatever reason, had placed a hold on the account. Those checks which could not be debited against the account on which they were drawn were entered on the customer bank's general ledger. While posting the checks, the computer identified in its files those checks which could not post against the accounts they were drawn on because they were large checks, "insufficient funds" checks, or checks on which the bank had put a hold. As a final part of processing the checks, an MTech operator ran the problem checks through the reader/sorter one more time as part of what is called "exception pull." During exception pull the computer verified the checks against the information in its files to see if the check was a check that should be debited, an insufficient funds check, or a hold check. The computer divided the checks by groups and deposited them into the multiple pockets on the machine. Reports identifying the problem checks by category were created at this time for the benefit of the customer bank. The checks were then bundled and an MTech employee put a label on them and moved them to where the regular checks were being held for delivery to MTech's customer banks. Prior to the exception pull, a report containing the regular checks was created, called the "posted transaction report." The regular checks were bundled and put into a suitcase to go to MTech's customer banks. The checks in question did not post to the proper account when they were processed by MTech. The checks were rejected for various reasons. The "Unpaid Items To Be Pulled Report" for Abrams Centre's work captured by MTech on August 15, 1986, reflected that the checks were rejected as "higher priority forced cut" checks and insufficient

funds checks. A higher priority forced cut check is a check that is rejected because other priority checks need to be paid ahead of it. The date listed at the top of the Unpaid Items to Be Pulled Report represents the date the work was captured. The printing of the report actually took place sometime Saturday morning, August 16, 1986. At 6:30 a.m., August 18, 1986, MTech transferred to Abrams Centre's courier the various reports and the checks processed on August 15 and 16, 1986. The checks in question subsequently arrived at Abrams Centre at about 8:00 a.m. on August 18, 1986. As part of its routine, upon receiving the previous business day's checks from MTech, Abrams Centre handled return checks or unposted checks first. The checks were handled by the officer for the Road Show account on August 18, 1986. Although the Road Show account showed a positive balance, it had a negative collected funds balance on August 18, 1986. On that date, the officer for the Road Show account contacted the customer, informing the customer that there were insufficient funds available in the Road Show account to pay the checks. The customer advised the bank officer that the customer would deposit sufficient funds into the account later that day. The customer failed to appear at any time on August 18, 1986, and certainly not before the end of Abrams Centre's banking day cutoff, i.e., 3:00 p.m., August 18, 1986. Thus, we know from Abrams Centre's own brief what next occurred: "[Abrams Centre's bank officer for the Road Show account] directed [Abrams Centre's cashier] to return the items unpaid. [The cashier] immediately instructed the items to be bundled and turned over to the next courier service for return to the Federal Reserve Bank of Dallas, which was early Tuesday morning, August 19, 1986." Therefore, it is undisputed that at no time prior to midnight, August 18, 1986, did Abrams Centre meet the deadline of August 18, 1986, for dishonor of the checks. Instead, Abrams Centre did no more than await the August 19, 1986, courier service for return to the Federal Reserve Bank. The checks were delivered to the courier for Abrams Centre on August 19, 1986, at 10:00 a.m. The bag of work picked up by the courier had instructions on it to return the checks to the Federal Reserve Bank. On August 19, 1986, the Federal Reserve Bank received a return item letter dated August 19, 1986, from Abrams Centre. On August 19, 1986, between 2:30 and 2:40 p.m., an employee of the Federal Reserve gave telephone notice to Texas American that the checks were being returned for insufficient funds. Thereafter, the checks were placed in a return item letter dated August 19, 1986, and mailed to TASI. TASI received the return item letter on August 20, 1986. TASI returned the checks to Texas American in a return item letter dated August 20, 1986. Texas American received the return item letter from TASI on August 21, 1986, six days after Texas American had initially presented the checks through collection channels.

### The Parties' Contentions

Texas American contends that the midnight deadline should be calculated from the day of presentment at MTech, the off-site processing center for Abrams Centre. Texas American further argues that Abrams Centre was required pursuant to the Dallas clearing house rules to return the checks before midnight, Monday, August 18, 1986. Abrams Centre insists that presentment did not occur when the checks were delivered to its off-site processing center. In addition, Abrams Centre asserts that, because the checks were presented at the off-site processing center after Abrams Centre's banking day cutoff, the true midnight deadline was midnight, Tuesday, August 19, 1986. I agree with Texas American. Under the undisputed facts, Abrams Centre's failure to return the checks before midnight, August 18, 1986, constituted a late return exposing Abrams Centre to strict liability for the face amount of the checks. I reach this conclusion for three reasons: first, delivery of the checks at MTech constituted presentment for purposes of triggering the midnight deadline clock; second, Abrams Centre's failure to meet the Dallas clearing house deadline for the return of dishonored checks constituted

final payment; and third, Abrams Centre is bound by Dallas clearing house rules through agreement with MBank. Therefore, in my view, the trial court erred in granting Abrams Centre's motion for summary judgment and in denying Texas American's motion for summary judgment. Consequently, I would sustain Texas American's sole point of error and reverse and render judgment in favor of Texas American.

### The Midnight Deadline

The Texas Business and Commerce Code provides that:

(a) *The effect of the provisions of this chapter may be varied by agreement* except that no agreement can disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care or can limit the measure of damages for such lack or failure; but the parties may by agreement determine the standards by which such responsibility is to be measured if such standards are not manifestly unreasonable.

(b) Federal Reserve regulations and operating letters, *clearing house rules,* and the like, *have the effect of agreements* under Subsection (a), whether or not specifically assented to by all parties interested in items handled.

TEX.BUS. & COM.CODE ANN. §§ 4.103(a), (b) (Tex. UCC) (Vernon 1968) (emphasis added). Hence, in my view, the provisions of the Code relied on by Abrams Centre have been varied by agreement in the form of the clearing house rules. Indeed, clearing house rules have the effect of agreements under section 4.103(b). *Pulaski Bank & Trust Co. v. Texas Am. Bank/Fort Worth, N.A.,* 759 S.W.2d 723, 734 (Tex.App.—Dallas 1988, writ denied). Moreover, the commentators appear uniform in their interpretation that, under section 4.103, clearing house rules supersede the statutory provisions of the Code. *Lockhart Sav. & Loan Ass'n v. Republic-Bank Austin,* 720 S.W.2d 193, 195 (Tex. App.—Austin 1986, writ ref'd n.r.e.) (citing J. BRADY, BRADY ON BANK CHECKS § 14.13, at 14–36 (H. Bailey rev. 5th ed. 1979); B. CLARK, THE LAW OF BANK DEPOSITS, COLLECTIONS AND CREDIT CARDS 5–16 (1970); WHITE & SUMMERS, HANDBOOK OF THE LAW UNDER THE UNIFORM COMMERCIAL CODE § 16–4 (2d ed. 1980); 6 J. REITMAN & H. WEISBLATT, BANKING LAW § 13.05 (1986); 8 BANKS AND BANKING ch. 18, § 2 (1971)). Therefore, the rules of the clearing house are an agreement varying the Code under section 4.103, so the deadline established supersedes the midnight deadline of section 4.104(a)(8) and section 4.301(a). *Lockhart Sav. & Loan,* 720 S.W.2d at 196.

The Dallas clearing house rule provides:

All members agree to have return items delivered to the DCHA [Dallas Clearing House Authority] office by 12:00 midnight of the first *business day* following presentment. Same day credit will be given for return items delivered prior to the 2:00 p.m. exchange and next day credit will be given for return items delivered between 2:00 p.m. and 12:00 midnight.

(emphasis added). The clearing house and its members interpreted the term "business day" to mean any calendar day other than weekends or bank holidays. The term "business day" cannot be defined in a vacuum; its definition must spring from the context in which it is used. Here, MTech's business day was Monday through Friday, twenty-four hours a day. Since the checks were received by MTech at 4:00 p.m., Friday, August 15, then, according to the unambiguous clearing house rule, Abrams Centre had until midnight, Monday, August 18, to honor the checks, dishonor the checks, or revoke the provisional settlement. Because Abrams Centre failed to do so, it is strictly liable to Texas American for the full amount of the checks. Indeed, there is a practical reason why Abrams Centre must be held accountable for the checks. Because the purpose of creating deadlines for returns is to facilitate the rapid release of funds deposited by check, it is not only reasonable but essential that banks be able to rely on time limits for returns. *Lockhart Sav. & Loan,* 720 S.W.2d at 196. Failure to return within the

proper time should be a reliable signal that a depository bank may release the funds to its customer. *Lockhart Sav. & Loan*, 720 S.W.2d at 196.

### Triggering the Midnight Deadline

Furthermore, delivery of the checks at MTech constituted presentment for purposes of triggering the midnight deadline clock. An independent, off-site data processing center is a place of presentment for checks triggering the midnight deadline rule of section 4.302. *See Pulaski Bank & Trust*, 759 S.W.2d 730–31. The majority rule is that the midnight deadline begins to run when the check is received by the off-premise processing center. *See First State Bank v. American Bank*, 732 S.W.2d 404, 405–06 (Tex.App.—Dallas 1987, no writ).

### Abrams Centre Bound by Clearing House Rules

Also, Abrams Centre is bound by the clearing house rules even though it is not a member of the clearing house. I reach this conclusion because Abrams Centre contracted with a clearing house member, MBank, to represent it as its agent for clearing house purposes. Hence, Abrams Centre has purposefully availed itself of the benefits of the clearing house. A nonmember bank which purposefully avails itself of the benefits through the use of a member agent must also accept the duties imposed by the clearing house. In *Capital City First National Bank v. Lewis State Bank*, 341 So.2d 1025 (Fla. 1st Dist.Ct.App. 1977), the court had little trouble binding a payor bank to the clearing house midnight deadline where the payor bank elected to participate in a clearing house by entering into a contract under which another bank agreed to receive checks. *See Capital City First Nat'l*, 341 So.2d at 1035. *Geibe v. Chicago Lake State Bank*, 160 Minn. 89, 199 N.W. 514, 516 (1924), reached the same result. Thus, though not a signatory to the clearing house agreement, I conclude that Abrams Centre elected to participate through MBank, a member bank, and so became privy to the clearing house rules. Indeed, I cannot conclude otherwise for the agreement between MBank and Abrams Centre dictates that Abrams Centre should be bound by the clearing house rule. Not only does the agreement create an express agency relationship between MBank and Abrams Centre for the purpose of clearing checks through the clearing house, but also the agreement explicitly states that Abrams Centre is desirous of effecting clearing house settlements in accordance with the by-laws of the Dallas Clearing House Association. Omitting formal parts, I set forth the agreement between MBank and Abrams Centre as an appendix.

### In Summary

As argued by Texas American, the system, as modified by the clearing house rule, worked in this case. In my view, Texas American's reasoning is compelling. MTech received, as Abrams Centre's designated agent for initiating the check collection process, the checks at about 4:00 p.m., Friday, August 15. Thus, according to the Dallas clearing house rule, Abrams Centre had until midnight, Monday, August 18, to pay the checks, revoke the provisional settlement, or send notice of dishonor. MTech had performed all bookkeeping and accounting functions for Abrams Centre. The checks were waiting at Abrams Centre when the bank officer charged with the responsibility for the account arrived at Abrams Centre on Monday. The Abrams Centre bank officer had until midnight Monday to decide whether to honor the checks. When the bank officer realized that checks were drawn on insufficient funds, he could have sent notice of dishonor, and no controversy would exist today. The return of the checks would have been timely. However, shortly after the bank officer realized that the checks were drawn on insufficient funds, the bank officer called the customer and told him that insufficient funds existed in the account to cover the checks. The bank officer waited for the customer. The customer never appeared. Still the bank officer failed to revoke the settlement and send notice of dishonor. The bank officer took a calculated risk, a risk that did not come to fruition,

a risk that Abrams Centre now attempts to shift to Texas American. Meanwhile, it is still Monday, August 18, 1986, and the bank officer left for the day without revoking the settlement. Thus, when the clock struck midnight, a magical event occurred. What the bank officer failed to do during the entire day of August 18, the Code did for him. At midnight, the Code transformed the provisional settlement on the checks to a final payment as a matter of law. Consequently, I would reverse the trial court's judgment and render judgment in favor of Texas American and against Abrams Centre.

### APPENDIX

WHEREAS, Abrams Centre National Bank is desirous of effecting daily clearing house settlements in accordance with the Constitution and By–Laws of the Dallas Clearing House Association, and Mercantile National Bank at Dallas is willing to lend its assistance toward effecting such purpose to the extent of paying to the Dallas Clearing House Association the amount of all checks, drafts, or orders for the payment of money drawn upon the Abrams Centre National Bank which are presented to said Dallas Clearing House Association by its several members and by the Federal Reserve Bank of Dallas; and,

WHEREAS, it is mutually profitable to both the Abrams Centre National Bank and the Mercantile National Bank at Dallas for Mercantile National Bank at Dallas to pay to the Dallas Clearing House Association the amount of all checks, drafts, or orders for the payment of money drawn upon Abrams Centre National Bank which are presented to said Dallas Clearing House Association by its several members and by the Federal Reserve Bank of Dallas, for Abrams Centre National Bank to repay to and hold Mercantile National Bank at Dallas harmless from all such payments made by Mercantile National Bank at Dallas for the benefit of Abrams Centre National Bank; and,

WHEREAS, the parties hereto desire that the several members of the Dallas Clearing House Association and the Feder-al Reserve Bank of Dallas present such checks, drafts, or orders for payment of money drawn upon Abrams Centre National Bank as may be desired, through the Dallas Clearing House Association:

NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS: That in consideration of the promises and mutual benefits and considerations passing from each to the other, it is mutually agreed by and between Abrams Centre National Bank and Mercantile National Bank at Dallas as follows:

1. Mercantile National Bank at Dallas agrees that all checks, drafts, or orders for the payment of money drawn upon Abrams Centre National Bank which come into the possession of and are cleared through the Dallas Clearing House Association may be debited against the account of Mercantile National Bank at Dallas, Dallas, Texas, as fully and in all respects the same as though said checks, drafts, or orders for the payment of money were drawn against said Mercantile National Bank at Dallas, Dallas, Texas.

2. Abrams Centre National Bank agrees to pay Mercantile National Bank at Dallas, on demand at its banking house in Dallas, Texas, all such sums as may be so debited against the account of Mercantile National Bank at Dallas. Said payment may be effected by debiting the account of Abrams Centre National Bank carried with Mercantile National Bank at Dallas. Abrams Centre National Bank further agrees and binds itself to hold said Mercantile National Bank at Dallas safe, whole and harmless against any and all losses, damage or expense which said Mercantile National Bank at Dallas may suffer or incur by reason of any and all checks, drafts, and other items drawn on said Abrams Centre National Bank and presented through and coming into the possessing of Dallas Clearing House Association or any of its member banks or

the Federal Reserve Bank of Dallas, and hereby agrees that its liability to Mercantile National Bank at Dallas shall be governed in accordance with, and subject to, the rules, regulations, and Constitution and By–Laws of the Dallas Clearing House Association and general banking practice and customs.