IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA17-1087

Filed: 5 June 2018

Transylvania County, No. 11 CVS 692

FRENCH BROAD PLACE, LLC, Plaintiff,

v.

ASHEVILLE SAVINGS BANK, S.S.B., Defendant.

Appeal by plaintiff from order entered 30 January 2017 by Judge Robert C. Ervin in Transylvania County Superior Court. Heard in the Court of Appeals 2 May 2018.

*Johnston, Allison & Hord, P.A., by Martin L. White and Scott R. Miller, for plaintiff-appellant.*

*Long, Parker, Warren, Anderson, Payne & McClellan, P.A., by Ronald K. Payne and Thomas K. McClellan, for defendant-appellee.*

TYSON, Judge.

French Broad Place, LLC ("Plaintiff") appeals the trial court's order granting summary judgment to Asheville Savings Bank, S.S.B. ("Defendant") and dismissing all of Plaintiff's claims. We affirm the trial court's order.

I. Background

*A. The Project*

Plaintiff initiated development of a mixed-use construction and development project in downtown Brevard, North Carolina, called "French Broad Place" (the

"Project") in 2007. The Project was planned as a four-story building, which would include office space, retail space, restaurants, residential condominiums, and an attached parking garage. The project's estimated cost was approximately $19,000,000. Plaintiff sought a construction lender to finance the Project, and eventually selected Defendant as a lender.

Plaintiff alleges Defendant proposed a tiered or "waterfall financing structure" that involved financing the Project in phases of development. Phase 1 allegedly included financing for purchasing the land for the Project, designing and constructing the building, and completion of the building shells of the individual units to the extent that a certificate of occupancy could be obtained. Phase 1 was projected to cost approximately $14,000,000.

Phase 2 was to allegedly include financing for finishing the build-out of the residential units and finishing certain common areas. Phase 2 was projected to cost approximately $5,000,000.

Plaintiff and Defendant executed a loan commitment dated 6 December 2007 (the "Loan Commitment"). The Loan Commitment specified Defendant would loan Plaintiff the sum of $9,950,000. Defendant denies that the loan it proposed to Plaintiff was to be phased, tiered, or include "waterfall financing."

The Loan Commitment included several conditions required to be met before closing. One Loan Commitment condition required Plaintiff to obtain $700,000 in "pre-sales" funds. The "pre-sales" requirement of the Loan Commitment specifically states,

> Prior to any Bank funding Borrower shall provide copies of purchase agreements totaling a minimum of $8,820,000 with a minimum of 10% non-refundable deposits. Of these pre-sales a minimum of $4,300,000 must be either commercial or office space. All purchase agreements must be reviewed and deemed acceptable by Asheville Savings Bank prior to Bank funding.
>
> Asheville Savings Bank shall be given first right of refusal on all pre-sales or sales to affiliated buyers. On those loans where Bank does not exercise that right, the Bank must receive and approve any and all written takeout commitments as well as any applicable lease agreements.

Plaintiff alleges that after execution of the Loan Commitment, "Defendant agreed to accept commercial leases with options to purchase in lieu of regular pre-sale contracts, and agreed to count the leases with purchase options toward the 'pre-sale contract requirement'" in the Loan Commitment. Plaintiff purportedly relied upon Defendant's alleged allowing of the lease-option contracts to count towards the Loan Commitment's pre-sales requirement, and it continued development and construction of the Project.

According to the affidavit of Joshua Burdette, a principal of Plaintiff, on 20 March 2008, several principals of Plaintiff purportedly met with officers of

Defendant, to discuss the method by which Defendant would apply the lease-option contracts to meet Plaintiff's pre-sale requirements under the Loan Commitment. At that meeting, Defendant's officers purportedly explained to Plaintiff's principals:

> [T]hat the lease option contracts alone could not be counted [towards] the required pre-sales under the Loan Commitment, but that [Defendant] could convert Plaintiff's construction loan into individual "Takeout Loans," . . . on any commercial units which were secured by a lease option contract, in lieu of a presale, and that the commercial units could simply be retained by Plaintiff as investment property to satisfy the presale requirements of the Loan Commitment.

Around 10 June 2008, Bradley Hines, a vice-president of Defendant, contacted members of Plaintiff, and informed them that the "Takeout Loans" arrangement would have to change. Plaintiff alleges Defendant instructed it to establish a separate legal entity to purchase the commercial units for which Plaintiff had previously obtained lease-option contracts: (1) the new entity was to establish deposit accounts in an entirely different bank than Defendant; (2) the new entity would enter into purchase agreements with Plaintiff for the commercial units that were subject to lease-option contracts; (3) the new entity would be pre-qualified to obtain take-out loans from Defendant on the commercial units secured by lease-option contracts; and, (4) Plaintiff's guarantors were to seek out and obtain financing term sheets from other banks to demonstrate the marketability of the commercial units.

Plaintiff followed Defendant's purported recommendations, and several of Plaintiff's officers and guarantors formed LBS Properties, LLC ("LBS") and implemented the steps allegedly proposed by Defendant.

In addition to the pre-sales requirement, another specific condition of the Loan Commitment provided Defendant was to "seek participant funding for no less than $2,000,000 from a participant Bank." Plaintiff alleges it did not understand the $9,950,000 loan commitment to be contingent upon Defendant actually obtaining the participation from another bank. Prior to the loan closing, Defendant informed Plaintiff that it had not been able to obtain the participation from another bank, and, as a result, that it would only be funding $7,750,000 of the $9,950,000 amount specified in the Loan Commitment. Defendant also requested Plaintiff to seek a replacement lender for the un-funded $2,000,000 of the loan.

Plaintiff had commenced construction on the Project well in advance of the loan closing. Plaintiff owed Metromont Corporation ("Metromont"), a subcontractor on the Project, for portions of the Project, which had already been erected. Plaintiff convinced Metromont to subordinate its contractor's lien for $2,200,000 for costs incurred in exchange for a secured interest in the Project.

On 8 August 2008, Plaintiff and Defendant closed on the construction loan agreement (the "Loan Agreement") in the specific amount of $7,750,000.00 (the "Loan"). The Loan was evidenced by a promissory note (the "Note") and deed of trust

in favor of Defendant. Plaintiff asserts the Loan Commitment required Defendant to loan the sum of $9,950,000, but that Defendant required Metromont to provide $2,200,000 in order to close. Plaintiff also alleges Defendant underfunded the Loan by approximately $300,000 at closing on 8 August 2008, and then wrongfully deducted another $300,000 from a draw Plaintiff sought on the Loan for October 2008.

In November 2008, Plaintiff submitted a change order request to Defendant in the amount of $725,801. Defendant approved the request and the parties agreed to a written loan modification (the "First Change in Terms Agreement"), which increased the stated total amount of the Loan outstanding from $7,750,000 to $8,475,801. Plaintiff alleges Defendant unnecessarily delayed in approving the change order until closing in January 2009.

By March 2009, three businesses were opening on the ground floor of the Project, several more were being constructed, and initial condominium sales were several months away from closing. Plaintiff alleges that in March 2009, Defendant began to refuse to finance the continued construction of the Project under the alleged phased or tiered funding, or "waterfall financing structure," as Defendant had allegedly promised. Defendant also refused to provide the allegedly promised take-out loans, which Plaintiff avers ultimately caused the Project to fail due to lack of funding.

Pursuant to a modification agreement the parties executed on 8 June 2009 (the "Second Change in Terms Agreement"), Defendant waived the required payment of the first $1,000,000 in release fees, due to Defendant upon the sale of commercial units in the Project, to help Plaintiff complete the construction on the Project. As required by the Second Change in Terms Agreement, the parties also executed a modification of Plaintiff's note, deed of trust and related loan documents regarding the Project. This Modification was recorded at Book 510, Page 398 of the Transylvania County Registry ("Modification of Note and Deed of Trust").

According to the express terms of this Modification, as of 8 June 2009:

> The total amount of all funds disbursed by Lender to Borrower to date under said Note, CLA [Construction Loan Agreement] and Deed of Trust, as amended by the LMA [Loan Modification Agreement] and Modification of Deed of Trust, included those funds deposited in the Interest Reserve Account, is $8,475,801.00. There are presently no Construction Loan funds left to be disbursed.

### B. The Complaint

Plaintiff filed a verified complaint against Defendant on 28 December 2011. In its complaint, Plaintiff asserts claims for breach of contract, unfair trade practices, and breach of a fiduciary duty. Defendant filed a motion to dismiss, an answer and counterclaim on 12 March 2012. In its counterclaim, Defendant seeks payment in full on the Note and asserts Plaintiff had failed to pay the balance Defendant is owed.

Upon a joint motion of the parties, the Chief Justice of North Carolina designated the matter as an exceptional case pursuant to Rule 2.1 of the General Rules of Practice of the Superior and District Courts on 1 October 2012.

Following discovery, Defendant filed a motion for summary judgment on 15 November 2016. Attached to Defendant's motion for summary judgment was an affidavit of Brian Gillespie, an employee of Defendant, and an affidavit of David A. Kozak, an executive vice-president of Defendant. In response to Defendant's affidavits, Plaintiff submitted affidavits of Joshua Burdette and Scott Latell, principals of Plaintiff.

The trial court entered an order granting summary judgment in favor of Defendant on all of Plaintiff's claims and also granting summary judgment in favor of Defendant on its counterclaim against Plaintiff. Plaintiff filed timely notice of appeal.

## II. Jurisdiction

Jurisdiction lies in this Court pursuant to N.C. Gen. Stat. § 7A-27(b) (2017) as an appeal from a final judgment of the superior court.

## III. Standard of Review

Upon ruling on a motion for summary judgment, the court views the evidence in the light most favorable to the non-moving party and engages in a two-part analysis of whether:

> (1) the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact; and (2) the moving party is entitled to judgment as a matter of law.
>
> Summary judgment is appropriate if: (1) the non-moving party does not have a factual basis for each essential element of its claim; (2) the facts are not disputed and only a question of law remains; or (3) if the non-moving party is unable to overcome an affirmative defense offered by the moving party.

*Erthal v. May*, 223 N.C. App. 373, 377-78, 736 S.E.2d 514, 517 (2012) (citations and quotation marks omitted), *disc. review denied*, 366 N.C. 421, 736 S.E.2d 761 (2013).

> A defendant may show entitlement to summary judgment by (1) proving that an essential element of the plaintiff's case is non-existent, or (2) showing through discovery that the plaintiff cannot produce evidence to support an essential element of his or her claim, or (3) showing that the plaintiff cannot surmount an affirmative defense. Summary judgment is not appropriate where matters of credibility and determining the weight of the evidence exist. Once the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a prima facie case at trial. To hold otherwise . . . would be to allow plaintiffs to rest on their pleadings, effectively neutralizing the useful and efficient procedural tool of summary judgment.

*Draughon v. Harnett Cty. Bd. of Educ.*, 158 N.C. App. 208, 212, 580 S.E.2d 732, 735 (2003) (citations and quotation marks omitted), *aff'd per curiam*, 358 N.C. 131, 591 S.E.2d 521 (2004).

An order granting summary judgment is reviewed *de novo* on appeal. *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 470, 597 S.E.2d 674, 693 (2004). The trial court's interpretation of a contract is also reviewed *de novo,* because it involves a question of law. *Harris v. Ray Johnson Constr. Co.*, 139 N.C. App. 827, 829, 534 S.E.2d 653, 654 (2000).

<u>IV. Analysis</u>

*A. Materials Considered by the Trial Court*

Plaintiff argues this Court should not consider documents contained within a Rule 11(c) supplement to the record on appeal filed by Defendant. Plaintiff contends Defendant only filed four documents in support of its motion for summary judgment: (1) the motion, (2) Defendant's unverified answer, (3) the affidavit of Brian Gillespie, and (4) the affidavit of David A. Kozak.

Rule 56(c) of the N.C. Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2017).

The proposed record on appeal was settled by agreement between the parties on 15 September 2017 and filed with this Court on 2 October 2017. The parties stipulated that they disagreed on whether numerous documents constituting

Defendant's Rule 11(c) supplement are properly part of the record on appeal. Plaintiff contends, while Defendant *served* the additional documents contained in and constituting its Rule 11(c) supplement with its brief in support of its motion for summary judgment upon opposing counsel and the trial court, Defendant did not *offer* the documents into evidence nor *file* the documents with the clerk of superior court. Defendant did present a copy to the trial court.

Presuming, *arguendo*, the trial court did consider the materials attached to Defendant's brief submitted to the court, Plaintiff failed to make any timely objection. Plaintiff argues it did not have to object, because the materials were not "filed" or "offered into evidence," even though they were provided in advance to Plaintiff and attached to Defendant's brief in support of its motion and were submitted to the trial court.

To support its assertion that it did not have to object to the documents at issue, Plaintiff cites the reasoning of Judge Greene's dissenting opinion in *Barnhouse v. Am. Exp. Fin. Advisors, Inc.*, 151 N.C. App. 507, 566 S.E.2d 130 (2002), as non-binding, but persuasive, authority. *Barnhouse* involved a pre-trial motion to stay proceedings and compel arbitration. 151 N.C. App. at 507, 566 S.E.2d at 131. The trial court denied the defendants' pre-trial motion to stay the proceedings and compel arbitration. *Id.* at 507-08, 566 S.E.2d at 130. On the defendants' motion to stay and compel arbitration, the trial court had conducted a hearing and the defendants had

submitted a brief in support of their motion and attached the alleged arbitration agreement to their brief. *Id.* at 510, 566 S.E.2d at 133.

The trial court denied the defendants' motion to stay and compel arbitration. *Id.* On appeal, this Court noted there was "no indication that the trial court made any determination regarding the existence of an arbitration agreement" and the "dispositive issue is whether the trial court properly denied [the] defendants' motion to stay proceedings without first determining whether or not an agreement to arbitrate existed between the parties." *Id.* at 508, 509, 566 S.E.2d at 131-32. This Court reversed the trial court's order because the trial court had not made a determination as to whether or not an agreement to arbitrate existed, and remanded to the trial court to make that determination. *Id.* at 509, 566 S.E.2d at 132.

Judge Greene disagreed with the majority's opinion that the trial court was to make findings regarding the existence of an arbitration agreement. *Id.* at 510, 566 S.E.2d at 132 (Greene, J., dissenting). He stated the "dispositive issue is whether defendants met their burden of showing the existence of a written agreement to arbitrate." *Id.* at 511, 566 S.E.2d at 133.

> Although defendants' attorney attached a copy of the alleged agreement to the memorandum submitted to the trial court, the memorandum does not qualify as a Rule 56(e) affidavit for two reasons: it was not sworn to, and it does not "show affirmatively that [the attorney] is competent to testify" with respect to the agreement. *See* N.C.G.S. § 1A-1, Rule 56(e). Furthermore, the attachment to the memorandum does not qualify as documentary

> evidence because the memorandum was not filed with the
> trial court or otherwise presented into evidence.

*Id.* at 512, 566 S.E.2d at 134 (footnote omitted). Without reference to any authority, the dissenting opinion argued, "[b]ecause [the arbitration agreement] was neither presented into evidence nor filed with the trial court, plaintiff had no obligation to lodge an objection to its consideration." *Id.* at 512, n. 6, 566 S.E.2d at 134, n. 6. Judge Greene voted to affirm the trial court's order denying the defendants' motion to stay the proceedings and compel arbitration. *Id.* at 512, 566 S.E.2d at 134.

Judge Greene's reasoning in *Barnhouse* is inapplicable to the case at bar for several reasons. *Barnhouse* involved a motion to stay the proceedings and to compel arbitration, not a motion for summary judgment. *See id.* at 507, 566 S.E.2d at 131. The majority's opinion in *Barnhouse* did not instruct the trial court to disregard the unverified agreement in determining whether an agreement to arbitrate existed upon remand, despite the dissenting opinion's viewpoint that the trial court could not and properly did not consider the unverified agreement to arbitrate, attached to the defendant's memorandum. *Id.* at 509, 566 S.E.2d at 132.

Plaintiff also cites *Gemini Drilling & Found., LLC v. Nat'l Fire Ins. Co. of Hartford* to support its assertion that it did not have to object to Defendant's submission of the documents at issue provided for the trial court's consideration. 192 N.C. App. 376, 665 S.E.2d 505 (2008). *Gemini* involved a bench trial on the plaintiff's contractual claims. *Id.* at 378-80, 665 S.E.2d at 507-08. On appeal, the defendant

argued "the trial court erred by rejecting and refusing to consider certain exhibits that defense counsel had marked as exhibits but did not formally offer into evidence." *Id.* at 386, 665 S.E.2d at 511. This Court noted, "[d]uring the trial, defendant marked twenty-seven exhibits, but only formally offered into evidence five of them." *Id.*

The defendant claimed its trial counsel had used the same language to enter into evidence the five admitted exhibits as it had eleven of the non-admitted exhibits "but, 'without Trial Counsel's notice, the Court's manner of reply changed, effectively denying admission even though the gist of the Court's response suggested that the documents were entered as evidence.'" *Id.* (emphasis omitted). The defendant asserted the trial judge had made the comment, "All the evidence has now been presented. Anything which was marked but not offered into evidence is not in evidence in this particular case[,]" right as the trial judge left the bench, leaving the defendant no opportunity to request the trial court to consider the exhibits that had not been formally offered into evidence. *Id.*

This Court, after reviewing the trial record, concluded the defendant "had ample opportunity to clarify and rectify the situation[,]" because the trial judge did not make the comment in question, quoted above, literally as the trial judge was leaving the bench, but before closing arguments. *Id.* After the trial judge made the comment in question, "[b]oth attorneys conversed with [the trial judge] before he

closed court and [the trial judge] specifically asked defense counsel if there was '[a]nything else' that he wanted the court to consider." *Id.* at 387, 665 S.E.2d at 512.

*Gemini* is easily distinguished from the case at bar and does not support Plaintiff's argument. The issue in *Gemini* regarded the trial exhibits and did not involve a motion for summary judgment. *See id.* The exhibits in *Gemini* had been presented at trial, and were not documents submitted in support of a pre-trial motion for summary judgment. *See id.*

The reasoning of *Gemini* actually rebuts Plaintiff's argument. The trial court in *Gemini* put the defendant on notice that it would not consider exhibits that had been marked, but not offered into evidence. *Id.* On appeal, this Court overruled the defendant's assignment of error, because the defendant had "an ample opportunity to clarify and rectify the situation." *Id.*

The materials at issue were not "on file" with the trial court because they had not been filed with the clerk of court in accordance with Rule 5(d) of the Rules of Civil Procedure. N.C. Gen. Stat. § 1A-1, Rule 5(d). Plaintiff does not deny the documents at issue were served upon it and attached to Defendant's brief in support of Defendant's motion for summary judgment in accordance with Rule 5(a1) of the Rules of Civil Procedure. *See* N.C. Gen. Stat. § 1A-1, Rule 5 (2017) (requiring briefs or memoranda in support of summary judgment, and other dispositive motions, to be served upon each of the parties at least two days before the hearing on the motion).

Defendant repeatedly referred to material in the documents at issue during the trial court's hearing on its motion for summary judgment, in which Plaintiff had ample opportunity to object to Defendant's submission of the documents.

Plaintiff has failed to cite any binding authority, which supports its assertion that it was not required to object to Defendant's submission of the documents at issue. Rule 56 of the Rules of Civil Procedure indicates a trial court is to only consider "the pleadings, depositions, answers to interrogatories, and admissions *on file*" in deciding whether to grant or deny summary judgment. N.C. Gen. Stat. § 1A-1, Rule 56 (emphasis supplied).

In other contexts, this Court has repeatedly held that a party's failure to object to materials submitted to a trial court, which do not comply with the requirements of Rule 56, waives that party's objection. *See Yamaha Int'l Corp. v. Parks*, 72 N.C. App. 625, 629, 325 S.E.2d 55, 58 (1985) (stating that, "[o]n a motion for summary judgment, uncertified or otherwise inadmissible documents may be considered if not challenged by timely objection."); *Whitehurst v. Corey,* 88 N.C. App. 746, 748, 364 S.E.2d 728, 729-30 (1988) (stating that "failure to object to form or sufficiency of pleadings and affidavits waives objection on summary judgment" and an "affidavit not conforming to Rule 56(e) is subject to motion to strike," but objection is waived absent the motion); *Crocker v. Roethling*, 217 N.C. App. 160, 165, 719 S.E.2d 83, 87-88 (2011) (holding, in part, that the plaintiff waived ten-day procedural notice

requirement of Rule 56(c) by participating in summary judgment hearing); *N. Carolina Nat. Bank v. Harwell*, 38 N.C. App. 190, 192, 247 S.E.2d 720, 722 (1978) (stating that "[f]ailure to make a timely objection to the form of affidavits supporting a motion for summary judgment [under Rule 56] is deemed a waiver of any objections." (citations omitted)).

Plaintiff acknowledges the materials were timely served upon it in connection with Defendant's brief in support of its motion for summary judgment accordance with Rule 5(c). N.C. Gen. Stat. § 1A-1, Rule 5(c). Plaintiff had adequate notice of the materials because of Defendant's repeated reference to them during the hearing on the motion for summary judgment. Plaintiff has offered no argument to support its notion that this Court should treat the disputed materials here any differently than other materials that do not conform to the requirements of Rule 56, and for which a party fails to make a timely objection before the trial court. Plaintiff was required to object to the disputed material's failure to be filed and failed to do so. *See Yamaha,* 72 N.C. App. at 629, 325 S.E.2d at 58; *Whitehurst*, 88 N.C. App. at 748, 364 S.E.2d at 729-30; *Crocker*, 217 N.C. App. at 165, 719 S.E.2d at 87-88; *Harwell*, 38 N.C. App. at 192, 247 S.E.2d at 722. Plaintiff's argument is overruled.

### *B. Affidavit of Scott Latell*

Defendant challenges the trial court's consideration of the affidavit of Scott Latell and two attached telephone conversation transcripts submitted by Plaintiff to

the trial court. Although the trial court ultimately granted summary judgment in favor of Defendant, Defendant contends the trial court erred in admitting and considering the affidavit and the two attached transcripts. In light of our holding to affirm the trial court's order granting summary judgment to Defendant, it is not necessary, and we decline, to address Defendant's objection to the trial court's consideration of Scott Latell's affidavit and the two attached transcripts.

## C. Breach of Contract

Plaintiff argues genuine issues of material fact exist in regard to its breach of contract claim. "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000).

Plaintiff's verified complaint alleges Defendant committed several breaches of the agreements the parties had entered into with regard to financing the Project, including:

> a. failing to provide the required amount of initial financing;
>
> b. underfunding the loan;
>
> c. delaying change-order requests;
>
> d. refusing to finance the Take-Out Loans as promised; and
>
> e. violating the covenant of good faith and fair dealing.

We analyze each alleged breach in turn.

1. Failure to Provide the Required Amount of Initial Financing

Plaintiff asserts the parties' Loan Commitment required Defendant to provide $9,950,000 in funds for initial financing from the Loan Agreement instead of the $7,750,000 provided and advanced at closing. Viewing the evidence in the light most favorable to Plaintiff including the loan documents attached to Plaintiff's complaint, no genuine issue of material fact exists of whether Defendant failed to provide the initial amount of financing. When the parties closed on the loan on 8 August 2008, in addition to the Loan Agreement, they executed a notice of final agreement containing a merger clause indicating it supersedes the earlier executed Loan Commitment. Specifically, the notice of final agreement states, in relevant part:

> BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT: *(A) THE WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES*, (B) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (C) THE WRITTEN LOAN AGREEMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES. [Emphasis supplied].

In addition, the Loan Agreement provides:

> RELATIONSHIP TO THE AGREEMENT: *The terms and provisions of this Agreement, the Note and the Related Documents supersede any inconsistent terms and*

> *conditions of Lender's construction loan commitment letter to Borrower*, provided that all obligations of Borrower under this commitment to pay any fees to Lender or any costs and expenses relating to the Loan on the commitment shall survive the execution and delivery of this Agreement, the Note and the Related Documents. [Emphasis supplied].

The plain language in the Loan Agreement, which Plaintiff does not contest it executed, indicates the Loan Agreement's provision for $7,750,000 in financing supersedes the earlier Loan Commitment's provision for $9,950,000.

The parties also executed the Second Change in Terms Agreement in June 2009, several months after Plaintiff alleges Defendant had failed to provide the initial amount of financing. The Second Change in Terms Agreement provides in relevant part:

> 13. <u>Ratification of all Loan Documents, as Modified.</u> Borrower and Lender agree that the Note, Deed of Trust, *CLA [Construction Loan Agreement] and all other Loan Documents*, as modified by the LMA [Loan Modification Agreement], the Modification of Deed of Trust and this Modification, are hereby ratified and confirmed to be in full force and effect and Borrower further confirms and agrees that there presently exists no defenses, offsets, or other claims with respect to the same, as modified hereby. [Emphasis supplied].

Based upon the clear and unambiguous language of the Loan Agreement and the two Change in Terms Agreements, Defendant was not obligated to provide the $9,950,000 in financing initially specified by the Loan Commitment. Presuming, *arguendo*, Defendant was obligated to provide the $9,950,000 under the Loan

Agreement, Plaintiff waived any claims it may have had for Defendant's failure to provide the initial amount of financing in the Second Change in Terms Agreement. Plaintiff does not dispute they entered into these agreements. No genuine issue of material fact exists with respect to this alleged breach. Defendant's argument is overruled.

### 2. Underfunding the Loan

Plaintiff also alleges Defendant breached the parties' loan contracts by underfunding the Loan. According to the Modification of Note and Deed of Trust executed by the parties on 18 June 2009, Defendant had disbursed all of the loan funds it was required to disburse under the parties' Loan Commitment, Loan Agreement, and later modifications. The Modification of Note and Deed of Trust both parties executed specifically provides:

> The total amount of all funds disbursed by Lender to Borrower to date under said Note, CLA [Construction Loan Agreement] and Deed of Trust, as amended by the LMA [Loan Modification Agreement] and Modification of Deed of Trust, including those funds deposited in the Interest Reserve Account, is $8,475,801.00. There are presently no Construction Loan funds left to be disbursed.

Plaintiff has failed to produce any writing or agreement contradicting the Modification of Note and Deed of Trust to indicate Defendant underfunded the loan. Plaintiff has not alleged Defendant entered into any subsequent modification of the Loan Agreement after 18 June 2009, which obligated Defendant to loan additional

funds beyond the stated amount. Plaintiff's arguments regarding Defendant's alleged underfunding of the loan are overruled.

### 3. Delaying Change Order Requests

Plaintiff also alleges Defendant breached the parties' loan agreements by its delay in approving Plaintiff's November 2008 change order request for $725,801. The Loan Agreement does not indicate Defendant was required to loan any more money at the time Plaintiff submitted its change order request. The Modification of Note and Deed of Trust executed by the parties and attached to Plaintiff's verified complaint specifically states:

> WHEREAS, at the request of Borrower, Lender agreed to lend Borrower an additional $725,801.00 by increasing the amount of the Construction Loan from $7,750,000 to $8,475,800.00. To reflect this increase in the amount of the Construction Loan, Borrower and Lender entered into a Change In Terms Agreement dated January 23, 2009 (the "LMA") increasing the amount of the Construction Loan, and the principal amount of the Note, from $7,750,000.00 to $8,475,801.00.

As analyzed above, Plaintiff specifically waived claims relating to the parties' obligations under the Loan Agreement and related documents in the Modification of Note and Deed of Trust, which states:

> Borrower and Lender agree that the Note, Deed of Trust, CLA [Loan Agreement] and all other Loan Documents, as modified by the LMA [Change in Terms Agreement], the Modification of Deed of Trust and this Modification, are hereby ratified and confirmed to be in full force and effect and Borrower further confirms and agrees that there

presently exists no defenses, offsets or other claims with respect to the same, as modified hereby.

Plaintiff has specifically waived any claim asserting Defendant has breached the Loan Agreement and related agreements by its purported delay in funding Plaintiff's change order request. The Loan Agreement and related modifications, which Plaintiff does not deny it executed and which are attached and referenced in its verified complaint, establish no genuine issue of material fact exists with regard to Defendant's alleged breach due to any purported delay in funding Plaintiff's change order request. Plaintiff's arguments are overruled.

### 4. Refusing to Finance Take-Out Loans

Plaintiff also alleges Defendant breached its loan agreements by failing to provide take-out financing for the purchase of commercial units by LBS, the additional ownership entity established by Plaintiff. Nothing in the terms of the Loan Commitment, Loan Agreement, and any related modifications obligated Defendant to provide take-out loans to either Plaintiff or LBS.

Brian Gillespie's affidavit, submitted by Defendant in support of its motion for summary judgment, states, in relevant part:

> 18. Shortly after the closing, Bradley Hines, with whom I worked on this project, and I began to make inquiry of French Broad Place, LLC as to how it was going with respect to obtaining loan commitments for the purchases by LBS. These communications continued over a period of time and we were constantly told that LBS had a lot of interest from other lenders to make the "take-out loans" to

LBS.

19.  Thereafter, an email was sent to Lyle Priest who had sent  two emails requesting loans for take-outs for LBS and Mr. Priest was informed that certain documentation would be needed in order for the LBS loan requests to be considered by Asheville Savings Bank.

20.  Subsequent to the request for financial information sought in an email dated February 17, 2010 from Bradley Hines, neither LBS nor any of the principals submitted any of the requested information necessary for Asheville Savings Bank to determine whether or not such loan could be approved.

Viewing the evidence in the light most favorable to Plaintiff,  nothing in the record challenges or contradicts Brian Gillespie's sworn statement that the LBS financial information requested by Defendant was not provided.  Additionally, Plaintiff has not provided written documents detailing the specific terms of any take-out loans that Defendant allegedly agreed to make, only an affidavit of Joshua Burdette, recollecting the essential terms of potential take-out loans discussed between the parties on 20 March 2008.  As discussed *supra*, when the parties closed on the construction loan on 8 August 2008, they executed a notice of final agreement which states, in relevant part:

BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT: (A) THE WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES, (B) *THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES,* AND (C) THE WRITTEN LOAN AGREEMENT MAY NOT BE CONTRADICTED

BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES. [Emphasis supplied].

Plaintiff has failed to produce or indicate the existence of any written agreement, which obligated Defendant to provide the alleged take-out loans. To the extent Defendant or its representatives may have orally promised to provide take-out financing prior to the execution of the Loan Agreement, the notice of final agreement entered into between the parties expressly disclaims the existence of any oral agreement or contract obligating Defendant to do so.

Additionally, any commitment to make a commercial loan in excess of $50,000 must be in writing and signed by the parties pursuant to the relevant statute of frauds. N.C. Gen. Stat. § 22-5 (2017).

Undisputed evidence indicates LBS did not make requests for take-out loans until February 2010, when it made requests for two loans. Both of these requests were for take-out loans of $460,000 and $797,000, respectively, well in excess of the $50,000 limit to trigger the statute of frauds.

Any commitment Defendant would have made to provide take-out loans in excess of $50,000 was required to be in writing and signed by the parties. *Id.* Plaintiff has not produced any such writing nor alleged such a writing exists. Plaintiff has failed to demonstrate any genuine issue of material fact exists that Defendant breached an agreement to provide take-out loans.

5. Violating the Implied Covenant of Good Faith and Fair Dealing

Plaintiff alleges Defendant breached their loan agreements by violating the implied covenant of good faith and fair dealing. "In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Bicycle Transit Authority v. Bell*, 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985) (citation omitted).

The undisputed terms of the parties' Modification of Note and Deed of Trust indicates Defendant had disbursed all of the loan funds it was contractually obligated to disburse under the parties' Loan Agreement and related modifications. Defendant exceeded the initial terms of the parties' Loan Agreement by agreeing to waive the first $1,000,000 in release fees owed in order to help Plaintiff. Plaintiff has failed to demonstrate any genuine issue of material fact that Defendant breached the covenant of good faith and fair dealing.

## D. Unfair or Deceptive Trade Practices

Plaintiff alleges Defendant engaged in unfair or deceptive trade practices based upon Defendant's alleged breaches of the loan agreements. "Breach of contract, even if intentional, can only create a basis for an unfair [or] deceptive trade practices claim if substantial aggravating circumstances attend the breach." *Rider v. Hodges*, __ N.C. App. __, __, 804 S.E.2d 242, 249 (2017) (citing *Watson Elec. Constr. Co. v. Summit Cos., LLC*, 160 N.C. App. 647, 657, 587 S.E.2d 87, 95 (2003)).

We decline to address if aggravating circumstances tend to support Plaintiff's unfair or deceptive trade practices claim. Plaintiff has failed to demonstrate any genuine issues of material fact exist that Defendant breached *any* of the parties' loan agreements. *See id.*

### E. Breach of Fiduciary Duty

Plaintiff alleges Defendant owed it a fiduciary duty "to act in good faith and with due regard to the interests of Plaintiff" and that Defendant breached its fiduciary duty by: (1) failing to provide the required amount of initial financing; (2) underfunding the loan; (3) delaying change-order requests; and (4) refusing to finance take-out loans as promised.

> For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties. Such a relationship has been broadly defined by this Court as one in which there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence . . . [and] it extends to any possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side, and resulting domination and influence on the other.

*Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707-08 (2001) (internal quotation marks omitted).

To establish a claim for breach of a fiduciary duty, claimants are "required to produce evidence that (1) defendants owed them a fiduciary duty of care; (2) defendants . . . violat[ed] . . . their fiduciary duty; and (3) this breach of duty was a

proximate cause of injury to plaintiffs." *Farndale Co., LLC v. Gibellini,* 176 N.C. App. 60, 68, 628 S.E.2d 15, 20 (2006). In North Carolina, the general rule holds:

> Ordinary borrower-lender transactions . . . are considered arm's length and do not typically give rise to fiduciary duties. In other words, the law does not typically impose upon lenders a duty to put borrowers' interests ahead of their own. Rather, borrowers and lenders are generally bound only by the terms of their contract and the Uniform Commercial Code.

*Dallaire v. Bank of Am., N.A.,* 367 N.C. 363, 368, 760 S.E.2d 263, 266-67 (2014) (internal citations omitted); *see Sec. Nat'l Bank of Greensboro v. Educators Mut. Life Ins. Co.,* 265 N.C. 86, 95, 143 S.E.2d 270, 276 (1965) ("There was no fiduciary relationship; the relation was that of debtor and creditor.").

"Nonetheless, because a fiduciary relationship may exist under a variety of circumstances, it is possible, at least theoretically, for a particular bank-customer transaction to give rise to a fiduciary relation given the proper circumstances." *Id.* at 368, 760 S.E.2d at 267 (internal citations and quotation marks omitted). To establish a fiduciary relationship in the creditor-debtor context, there "must [be] some additional fact which tends to elevate the relationship above that of a typical debtor and creditor." *Lynn v. Federal Nat. Mort. Ass'n*, 235 N.C. App. 77, 82, 760 S.E.2d 372, 376 (2014).

> A fiduciary duty, in the context of a financing party to a corporation, arises only when the evidence establishes *that the party providing financing to a corporation completely dominates and controls its affairs. Edwards v. Bank*, 39

> N.C. App. 261, 277, 250 S.E.2d 651, 662 (1979); *Pappas v.
> NCNB Nat. Bank of North Carolina*, 653 F.Supp. 699, 704
> (M.D.N.C. 1987). Further, to justify the imposition of a
> fiduciary obligation on a party financing the affairs of a
> corporation, it must be shown that the financing party
> essentially dominated the will of its debtor. *In re Prima
> Co.*, 98 F.2d 952 (7th Cir. 1938), *cert. denied*, 305 U.S. 658,
> 83 L.Ed. 426 (1939).

*Multifamily Mortg. Tr. 1996-1 v. Century Oaks Ltd.*, 139 N.C. App. 140, 146, 532 S.E.2d 578, 581-82 (2000) (emphasis supplied).

Here, there is no genuine issue that Plaintiff and Defendant were in a debtor-creditor relationship, which is not *per se* a fiduciary relationship. *See Dallaire*, 367 N.C. at 368, 760 S.E.2d at 266-67. Plaintiff alleges and argues Defendant so thoroughly dominated the will of Plaintiff with respect to the Project that a fiduciary relationship existed between them.

Plaintiff asserts the following facts tend to show Defendant dominated and controlled Plaintiff's affairs: Defendant's control of distribution and withdrawals to members and all buy/sell agreements between the members for membership interests, Defendant's giving of legal advice regarding how to set up LBS, Defendant's dictating of financing regarding Metromont, Defendant's promise to make take-out loans upon which Plaintiff relied, and Plaintiff's utter dependence on Defendant's financing.

"As a matter of law, there can be no fiduciary relationship between 'parties in equal bargaining positions dealing at arm's length, even though they are mutually

interdependent businesses.'" *Dreamstreet Investments, Inc. v. MidCountry Bank*, 842 F.3d 825, 831 (4th Cir. 2016) (quoting *Strickland v. Lawrence*, 176 N.C. App. 656, 662, 627 S.E.2d 301, 306 (2006)).

Reviewing the evidence in the light most favorable to Plaintiff, nothing tends to show the relationship between Plaintiff and Defendant was anything other than an agreement between two sophisticated commercial entities dealing at arm's length. Undisputed evidence in the record indicates Plaintiff's development team members had accumulated nearly 150-years' worth of combined experience in commercial real estate construction and development before entering into the loan agreements with Defendant.

Additionally, Mark Latell, a principal of Plaintiff, indicated in his deposition that Plaintiff had retained a consultant, Lyle Preest, to help them find lenders for the Project. Mr. Latell described Mr. Preest as "very knowledgeable with banking and lending and borrowing." Numerous emails submitted to the trial court show correspondence between Mr. Preest and Bradley Hines, the vice-president of commercial lending of Defendant, dating from before and after the closing of the Loan Agreement. These emails discuss several critical matters relating to the loan agreements, including Plaintiff obtaining third-party financing, obtaining take-out financing, and the pre-sales of commercial units.

Nothing indicates Plaintiff reposed any sort of special confidence in Defendant to create a fiduciary relationship. *Dalton*, 353 N.C. at 651, 548 S.E.2d at 707. Plaintiff's consultation with Lyle Preest as an outside expert is inconsistent with a fiduciary relationship. *See Branch Banking & Trust Co. v. Thompson*, 107 N.C. App. 53, 61, 418 S.E.2d 694, 699 (1992) (finding no fiduciary relationship on action for summary judgment where party asserting fiduciary relationship with bank consulted with banker and accountant before entering into agreement); *see also Sullivan v. Mebane Packaging Grp., Inc.*, 158 N.C. App. 19, 33, 581 S.E.2d 452, 462 (2003) (finding evidence that complaining party obtained outside counsel rebuts existence of fiduciary relationship necessary for constructive fraud claim). Furthermore, nothing in the record indicates Plaintiff was foreclosed from consulting with an attorney, or other advisors of its choice, prior to executing the Loan Commitment and Loan Agreement with Defendant.

No evidence tends to show Defendant "essentially dominated the will" of Plaintiff or "completely dominate[d] and control[led]" Plaintiff's affairs. *Multifamily Mortg.,* 139 N.C. App. 140, 146, 532 S.E.2d 578, 581-82 (2012) (citations omitted).

No genuine issue of material facts exists of whether Plaintiff and Defendant were in a fiduciary relationship. Plaintiff has not produced evidence tending to show this essential element of a breach of fiduciary relationship claim. The trial court's order properly granted Defendant summary judgment on this claim.

### F. Defendant's Counterclaim on Promissory Note

Plaintiff argues the trial court erred in granting Defendant's motion for summary judgment on Defendant's counterclaim for payment on the promissory note. The promissory note was executed by Plaintiff on 8 August 2008 for the principal amount of $7,750,000.00. This note was modified by the First Change in Terms Agreement on 23 January 2009, and the principal amount was increased to $8,475,801.00. On 8 June 2009, Plaintiff executed a Second Change in Terms Agreement, which altered the formula used to calculate the interest rate.

In support of Defendant's motion for summary judgment, Defendant submitted the affidavit of David A. Kozak, executive vice-president of Defendant. David A. Kozak stated that Defendant was owed $10,491,440.16 along with interest and attorney's fees per the parties' Loan Agreement and that Plaintiff had defaulted.

Plaintiff argues due to Defendant allegedly breaching its obligations under the loan agreements, Plaintiff is not obligated to pay on the note. The uncontradicted evidence in the form of the parties' 18 June 2009 Modification of Note and Deed of Trust shows Defendant disbursed all funds it was required to loan under the agreements evidenced by the note. Plaintiff has not presented any evidence to contradict David A. Kozak's affidavit stating Plaintiff was in default.

Based upon our holding to affirm the trial court's determination that Defendant is entitled to summary judgment on Plaintiff's breach of contract claims,

no genuine issue of material fact exists with regard to Defendant's counterclaim for collection on the stated and uncontested sums in the note with interest and contractually-agreed attorney's fees. Plaintiff's arguments are overruled.

## V. Conclusion

Viewing the evidence in the light most favorable to Plaintiff, Plaintiff has failed to establish any genuine issue of material fact exists with regard to its claims for breach of contract, unfair or deceptive trade practices, and breach of fiduciary duty. Plaintiff has also failed to demonstrate any genuine issue of material fact exists with respect to Defendant's counterclaim for contribution on the promissory note. Defendant is entitled to summary judgment as a matter of law with respect to Plaintiff's claims and its counterclaim. The trial court's order granting summary judgment to Defendant is affirmed. *It is so ordered.*

AFFIRMED.

Judges ELMORE and ZACHARY concur.